COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Huff, Judges Russell and Malveaux
Argued at Richmond, Virginia

RUSSELL ERVIN BROWN, III

                                                    OPINION BY
v.      Record No. 0434-17-2              CHIEF JUDGE GLEN A. HUFF
                                                    MAY 22, 2018
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF DINWIDDIE COUNTY
Paul W. Cella, Judge

Matthew L. Engle (Bernadette M. Donovan; Douglas A. Ramseur;
Seth T. Shelley; Shameka L. Hall; Jacqueline M. Reiner; Donovan
& Engle, PLLC; Office of the Capital Defender, Central Region;
Jacqueline M. Reiner, PLLC, on briefs), for appellant.

Eugene Murphy, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

Russell Ervin Brown, III, ("appellant") appeals his convictions of capital murder and

attempted capital murder, in violation of Code § 18.2-31; attempted murder, in violation of Code

§ 18.2-32; and three counts of use of a firearm in the commission of a felony, in violation of

Code § 18.2-53.1. Following a jury trial, the Circuit Court of Dinwiddie County ("trial court")

sentenced appellant to the jury's recommended sentence of two life sentences for the capital

murder and attempted capital murder charges, ten years for the attempted murder charge, and a

total of thirteen years for the firearm charges. On appeal, appellant raises seven assignments of

error:

> 1. The trial court erred in denying [appellant's] Motion for
>    Grand Jury Information for the Preceding Five Years.
>
> 2. The trial court erred in denying [appellant's] motions for
>    change of venue.

3. The trial court erred in limiting questioning and denying [appellant's] motion to strike prospective jurors Delores Palmer and Aaron Whitworth for cause.

4. The trial court erred in denying [appellant's] motion to strike the capital murder charge.

5. The trial court erred in denying a second-degree murder instruction.

6. The trial court erred in admitting testimony about an alleged statement made by [appellant] during his arraignment.

7. The trial court erred in denying [appellant's] Motion to Set Aside the Verdict.

For the following reasons, this Court affirms appellant's convictions.

## I. BACKGROUND

On appeal, "we consider the evidence and all reasonable inferences flowing from that evidence in the light most favorable to the Commonwealth, the prevailing party at trial." Williams v. Commonwealth, 49 Va. App. 439, 442, 642 S.E.2d 295, 296 (2007) (*en banc*) (quoting Jackson v. Commonwealth, 267 Va. 666, 672, 594 S.E.2d 595, 598 (2004)). So viewed, the evidence is as follows.

### The Shooting

On March 7, 2013, appellant shot and killed Virginia State Trooper Junius Alvin Walker on the shoulder of Interstate 85 in Dinwiddie County. Appellant had pulled his car onto the shoulder because it "had been running hot." Walker activated his police cruiser's blue lights and pulled over beside appellant's car, at which point appellant—without provocation—fired numerous shots into the cruiser at Walker, killing him. As Walker's cruiser rolled toward the woods beside the interstate, appellant followed and continued firing his rifle into it.

Thomas Hales, a delivery truck driver, was heading south on Interstate 85 at the time of the shooting. Noticing the state police cruiser resting at the edge of the woods and finding it

unusual, Hales pulled his truck onto the shoulder and backed toward appellant's car and the cruiser. He saw Walker sitting in the cruiser's front seat "kind of slumped over" and was unsure if Walker was alive. "[J]ust a few seconds" after Hales stepped out of his truck to investigate the scene, he observed appellant—dressed in camouflage and holding a rifle—abruptly stand up opposite him on the cruiser's passenger side. Hales fled back to his truck, and just as he made it into the driver's seat, appellant fired multiple rounds at the truck, blowing out its passenger window and the windshield in front of the driver's seat. Hales returned to the interstate as quickly as he could, took the next exit, and called 911 to report the encounter.

Meanwhile, Virginia State Police Trooper Samuel Moss came upon the scene. He saw the conspicuous collection of appellant's car, Walker's police cruiser partially in the woods, and Hales' delivery truck parked off the interstate. He could hear the gunfire as he pulled his cruiser onto the shoulder. As Moss parked, Hales' box truck began to pull away from the scene. Moss later testified that he "had no clue what was going on" when he arrived because "[t]here was no 911 call or anything like that. It was literally something [he] just came up on." At this point, appellant turned his attention from Hales' truck to Moss and began firing at Moss. Moss exited and took cover at the cruiser's rear, where he exchanged gunfire with appellant.

As the gunfight raged on, Moss recognized he needed a more powerful weapon than his sidearm in order to hold his position. He crept back to the driver's seat to release the trunk, then returned to his position at the left rear tire from which he was able to retrieve his M4 rifle from the trunk. Moss then fired at appellant, who had taken cover inside the passenger cabin of Walker's cruiser. Appellant responded by diving from the cruiser onto the ground and returning

- 3 -

fire from a prone position.[1]  Appellant used the surrounding brush as cover as the altercation continued, "hiding behind [the brush], popping out, shooting, going back for cover."

Eventually, appellant ran toward the front of Walker's car into the woods and ceased firing.  Moss could not see where appellant went, but remained in position scanning for him because Moss "didn't want him to come across the wood line and get a better angle on me." Backup officers arrived on the scene shortly thereafter.  The gunfight ultimately had lasted "several minutes," which was far longer than the "five or six seconds" Moss's training taught him to expect.  Moss later testified that "the shots just kept coming" and that he wondered "[h]ow much [ammunition] has he got over there?"  Appellant fired no fewer than twenty-nine rounds during the exchange.

Appellant fled into the woods after the gunfight, where he abandoned his rifle and clothing.  Immediately opposite the roadside scene, just through a stand of woods, was a small towing business' unfenced rear salvage lot containing several wrecked vehicles.  Appellant located a sedan there with missing windows and hid in its rear passenger floorboard area.

Dinwiddie County Sheriff's Office Investigator Charles Lucy was familiar with the area and heard over the radio that appellant had retreated into the woods, so he responded to the towing business in order to intercept appellant.  Lucy located the sedan and approached to "clear" it for his safety.[2]  As he did so, he observed appellant lying naked on the rear floorboard. Lucy called for backup and ordered appellant to put his hands up.  Appellant yelled "don't kill

---

[1] Moss later testified that assuming a prone position meant lying on one's stomach.  He stated that state troopers are instructed shoot from a prone position because it creates "a smaller target," making them "much harder to hit" and allowing them "to steady your weapon even more."  Moss testified that appellant's actions in taking the prone position and returning fire is "what [he would] have done" in the same situation given his training.

[2] The investigator later testified that "clearing a vehicle" meant to approach it, "make it safe, know that there's [sic] no threats inside that vehicle that can shoot or do anything, any harm" to an officer.

- 4 -

me," and responding backup officers arrested him. Lucy later testified that appellant's nudity made it less likely that law enforcement officers would fire on him. Lucy stated that because appellant wore no clothing and had visible hands, he was "able to maintain cover on [appellant] . . . which made [him] relax a bit." Lucy clarified that had appellant been clothed, the situation "would have been very, very high elevated" because he knew he was responding to "an officer-involved shooting."

Following appellant's arrest, Virginia State Police Trooper Walter Craig transported him to a state police office where officers instructed him to "sit there and be quiet." Without any prompting, appellant volunteered various statements about his actions that day that Craig later recounted at trial:

> He stated that he sat in his car for a while, watching traffic go by; and while he was sitting in his car, he was talking to his father,[3] and a police car pulled up beside him on the shoulder, with no lights.
> He also stated that he knows procedure, and police are supposed to pull behind you with lights on and call for backup. He stated that he didn't see lights, and he saw the black officer's face and that he looked like a dead man and didn't know it. [Appellant] stated that as he saw the officer's face, he didn't know what happened, and he turned into a demon, and he picked up his rifle and shot him, and the police car kept rolling in the grass. And he got out of his car; and after the car crashed, he kept shooting him.
> He stated that he tried to get his gun, but he couldn't get his gun because he knew the type of holster and safety that was used. [Appellant] stated that a truck stopped, and he shot at him too, but he hoped that the truck driver was okay, as the truck left.
> [Appellant] stated that a white police [officer] showed up, and he shot at him too. He stated that his father told him to leave, and he ran through the woods and the water. He took off his clothes, and his Browns hat, and dropped them in the woods. He stated that he saw a junk car, and he laid down in it, and he said that a white officer shined a light in his face, and his father told him to put his hands up and tell the truth.

---

[3] Appellant's biological father suffers from schizophrenia and lives in an adult care facility. His condition, which ranged "between floridly psychotic and in remission," made it nearly impossible to conduct an ordinary conversation with him. Officers recovered no mobile phone or other means of communication from the scene.

Grand Jury

A Dinwiddie County grand jury indicted appellant for the capital murder of Walker, attempted capital murder of Moss, attempted murder of Hales, and three counts of using a firearm in the commission of a felony. Appellant pled not guilty to all charges.

In a July 14, 2015 motion, appellant sought disclosure of "all grand juror information for the preceding five years" in order to prepare a potential Sixth Amendment fair cross-section challenge to the Dinwiddie County grand jury selection process. Counsel for appellant contended that the previous five years of data were necessary in order to "arrive at statistically-sound calculations." During a hearing on October 7, 2015, the trial court asked the Commonwealth whether it agreed that "the Defense is entitled to the jury list for the term in which this case is scheduled to be tried." The Commonwealth conceded that good cause existed for granting appellant access to the grand jury list for the 2016 term. The trial court then asked the Commonwealth whether its position was that "prior grand jury lists from prior years are not pertinent to this case." The Commonwealth agreed, noting its concerns for citizens' privacy given the voluminous nature of the request. The trial court ultimately ruled in a letter opinion that appellant was entitled only to the "jury list for the 2016 term in which this case is tried."

Jury Selection

Appellant also moved to change venue citing the extensive media coverage of Walker's murder and the closeness of the Dinwiddie community. The trial court denied that motion, noting that it was "not prepared to move this case to a different jurisdiction without even attempting to seat a jury."

Jury selection in fact took six days, during which the trial court questioned six panels of twenty prospective jurors each in order to form a pool of twenty-eight from which twelve jurors and four alternates would be selected. The trial court began by asking each panel preliminary

questions and dismissing jurors it found were unqualified based on those questions, then it called in the remaining prospective jurors individually for more detailed questioning by the attorneys. On the first day of jury selection, the trial court asked whether any members of the first panel had "heard anything about this case from any source such as the news media." Reviewing the response, the trial court observed, "[i]t appears as if almost everybody has." Following extensive examination by the attorneys, five jurors were qualified from the first panel and seven were excused for their familiarity with Walker or preconceived opinions of appellant's guilt.[4] Of the second panel, only two of the prospective jurors had not heard about the case from the media or other sources. The trial court qualified six people out of the second panel and excused another six for their familiarity with Walker or belief in appellant's guilt.

The trial court asked the third panel whether anyone had learned information about the case from sources such as media reports that might affect their impartiality; six prospective jurors responded affirmatively. After individual examination of the panel members, the trial court qualified four members and excused two because of their familiarity with Walker or belief that appellant was guilty. In the fourth panel, several jurors indicated familiarity with the case from media or other sources, and ten had formed a prior opinion of appellant's guilt or innocence. The trial court ultimately qualified six jurors from the fourth panel after detailed individual examination by the attorneys and excused eight for their familiarity with Walker or fixed opinion that appellant was guilty.

The trial court considered a fifth panel, asking the usual preliminary questions including whether anyone had heard anything about the case from sources like the media. The trial court observed that "frankly, virtually everybody in the group" had heard something about the case.

---

[4] The remaining members of the twenty-person panel here and in subsequent panels were excused for other reasons, foremost among which were fixed views for or against the death penalty and inability to understand the different burdens of proof involved in the case.

Following individual examination, the trial court qualified five prospective jurors and excused eight based on their familiarity with Walker or opinion that appellant had committed the charged crimes. After the fifth panel, the trial court had qualified twenty-six of the twenty-eight jurors necessary to proceed. It accordingly summoned a sixth panel of twenty jurors, half of whom acknowledged hearing about the case from sources like the media. The trial court qualified the first two prospective jurors individually questioned by the attorneys, completing the pool of twenty-eight members. Both parties made their peremptory strikes on the following day, leaving the final jury of twelve members and four alternates.

Two members of the final jury, Delores Palmer and Aaron Whitworth, survived motions to strike for cause during the initial selection process. Asked by one of the Commonwealth's attorneys whether she had formed any opinions regarding appellant's guilt, Palmer indicated she believed "he did it" and noted that opinion was based on the media reports about the crime. She immediately thereafter stated that she "still [had] to draw my own answer" and that "my opinion just now wouldn't decide on what I heard. I need to, like I told you before, to hear the rest of the facts of what happened . . . . I could decide from that." During examination by defense counsel, she maintained that she could put her opinions aside. She stated: "We all form—everybody form[s] opinions, but to hear the facts would decide my decision once everything is laid out . . . because that was then; this is now. . . . I can come to a clear conclusion after everything is said and done." Appellant moved to strike Palmer based on her preformed opinion that appellant was guilty. After hearing argument, the trial court ruled that

> the standard is whether a person has some fixed opinion that would prevent them from hearing the evidence and deciding the case based on the evidence. And the fairest characterization of her answer as a whole was, "Yes, I had an opinion. I heard something about this in the news, but I would have to listen to the evidence before deciding the case." So your motion will be overruled[.]

Appellant similarly moved to strike Whitworth, who eventually became the jury foreperson, because of his familiarity with the case from media reports and his prior experiences with mental health issues during a divorce. During the Commonwealth's questioning, Whitworth affirmed that he would be able to decide the case "based solely on the evidence presented in the courtroom." He conceded that he had "followed [the case] pretty heavily when it happened" and that "[i]t would be hard not to form an opinion" about the case based on the media exposure. He stated that "[i]t would be very difficult to—you can't unlearn something, and especially with something that was as shocking as what happened to Trooper Walker. You can't leave that at the door, and that is all I was alluding to." He clarified that he did not "know enough about what happened to be able to base a judgment on that" and indicated that he would not let the media reports about the case affect his judgment. Despite becoming emotional while discussing his prior personal experiences with mental health issues in his family, Whitworth maintained those experiences would not prevent him from fairly considering appellant's case. The trial court ruled:

> Well, he was a thoughtful and emotional individual, but, as I said, that is not a disqualification.
> I think he indicated that his wife had some mental difficulties in his judgment and that he had some media information, but I think he was sufficiently rehabilitated in that he indicated that he would not let the media coverage affect his judgment. I think he made the statement that the media is entertainment.
> I think he also said, after a thoughtful presentation, that he would not let his issues with his wife affect his judgment regarding the mental health evidence in the case, so I think that he was sufficiently rehabilitated, and the motion will be denied[.]

Appellant renewed his motion to change venue at the conclusion of jury selection, arguing that the difficulty in seating a jury justified the relocation. Appellant emphasized the length of time jury selection took and the pervasive media coverage that the vast majority of the venire had seen. In its ruling from the bench, the trial court first noted the presumption that "the

- 9 -

defendant will receive a fair trial in the jurisdiction where the offense occurred and that . . . the defendant bears the burden of overcoming this presumption." The trial court recognized that media publicity and appellant's proposed insanity defense to the capital murder charge were special considerations that necessitated a longer selection process. It noted that the slower selection process "was due to the fact that we were being thorough and careful about a case that involved multiple considerations." After discussing in considerable detail the governing precedent and arguments by counsel, the trial court denied the motion.

Proceedings at Trial

At the conclusion of the Commonwealth's case-in-chief, appellant moved to strike the capital murder charge on the grounds that the Commonwealth did not prove appellant's intent to interfere with Walker's official duties. Finding that the Commonwealth's evidence supported an inference of that intent, the trial court denied the motion.

The defense case-in-chief emphasized appellant's mental condition as it endeavored to establish that appellant was not guilty by reason of insanity. Dr. Evan Nelson, an expert in clinical psychology appointed at the Commonwealth's request, testified for the defense that he had interviewed appellant and considered voluminous other materials in order to reach an opinion regarding appellant's mental state at the time of the offense. After explaining his methodology, Nelson opined that, at the time of the offense, appellant "knew what he was doing, but he lacked the capacity because of his mental illness to appreciate the wrongfulness of his actions." He clarified his opinion as follows:

> He knows that this is a gun. He knows that he's shooting a gun. He knows that he has killed a police officer. He repeatedly said that. He knows what his action was, but he has a delusional understanding of the wrongfulness. In this case he believes the wrongfulness is fulfilling some sort of mission from God that's been preordained. . . . Mental illness doesn't simply start up in the moments just before the offense. All this is a process. People decline into it. . . . [C]oming into the moment of this offense, he

- 10 -

already had such a strong belief in these religious delusions that he was willing to act on them. . . . And so when he tells us a delusional idea of why he shot the officer, it makes it more credible to believe, because he has a history of doing that.

Nelson reiterated that appellant "did understand the criminal nature of his acts in the sense that—knowing the nature, character, and consequences of them, yes," but emphasized that "he thinks that the nature of his actions [is] not wrongful in any sort of measurable way that matters to him, because he's acting for God from the delusion."

On cross-examination, Nelson acknowledged that "[a] very large number of criminal defendants, unfortunately, are mentally ill at the time they commit their crimes, but that doesn't mean that they necessarily meet the test for insanity. The mental illness may be highly relevant to what they did but not necessarily meet the test." The Commonwealth's cross-examination also revealed that Nelson had not interviewed several individuals involved in the case, that appellant was unable to recall the weeks before and after the offense in his interviews with Nelson in 2016, and that Nelson had been unable to contact people appellant had telephoned in the hours prior to the shooting. Nelson's report characterized these eventualities as "very unfortunate" because appellant's memory loss precluded him from "provid[ing] any guidance on the meaning of his ideas or behaviors, none that would point towards or away from insanity" and because his conversations prior to the shooting could have helped "define whether he planned the murder or not or if his motives were rational or insanity." Nelson also acknowledged that appellant had "multiple rational motives for shooting a police officer that day" and that "several of [appellant's] actions pointed away from insanity . . . and towards an awareness that his actions were legally wrong."

Appellant also called Dr. Sara Boyd, an expert in forensic psychology appointed for the defense. Boyd, like Nelson, reached the opinion that appellant was delusional to the point of not understanding that his actions were wrong. She testified that she made that determination

"because [appellant] was unable to appreciate the wrongfulness of his actions because of these delusions that he had, these fixed false beliefs" among which was "that God wanted him to shoot Trooper Walker as a test of [his] faith." On cross-examination, Boyd acknowledged that although she did interview appellant, she did not interview several individuals connected to the case and that she did not seek any additional information from the prosecution or law enforcement beyond the statements and interrogation transcripts provided by defense counsel. She testified that, in her report, she recognized appellant's statements during police interrogation "showed that he was aware (at least at the time of interrogation) that his actions were illegal and in fact were a capital offense."

After the defense rested its case-in-chief, the Commonwealth presented rebuttal evidence. Among the rebuttal witnesses called was Brad Mann of the Dinwiddie County Sheriff's Office, who testified that he was in the courtroom when appellant made his first court appearance in this case. Counsel for appellant objected when the Commonwealth's attorney asked what Mann heard appellant say during that appearance on the grounds that it was beyond the scope of the defense case and that the Commonwealth did not provide notice of the statement during discovery. The trial court indicated that it was "not going to get into a discovery dispute" and requested the parties argue the objection's substance. After hearing the Commonwealth's proffer of Mann's testimony and argument from both parties, the trial court overruled the objection because the testimony was "relevant as rebuttal to the defense expert testimony that [appellant] didn't know what he was doing was wrong." Mann ultimately testified that during appellant's arraignment, he heard appellant state in open court: "I'm guilty. Go ahead and stick the needle in my arm."

Defense counsel renewed appellant's motion to strike at the conclusion of all evidence, arguing that reasonable minds could not differ with respect to appellant's insanity defense in

- 12 -

light of the uncontradicted evidence of appellant's condition at the time of the offense. The Commonwealth responded that the insanity defense was a jury issue for which appellant bore the burden and that the Commonwealth had established a *prima facie* case. The trial court agreed that the issues raised in appellant's argument were jury questions and overruled the motion.

The defense also requested a second-degree murder jury instruction, to which the Commonwealth objected on the grounds that the instruction was not supported by more than a scintilla of evidence. The trial court found that insufficient evidence had been presented to support a second-degree murder instruction and accordingly denied it.

After deliberation, the jury returned guilty verdicts for all charges. Before proceeding to the sentencing phase, counsel for appellant moved to set aside the verdict as contrary to the law and evidence presented, specifically emphasizing the expert opinions regarding appellant's insanity. The trial court overruled the motion, again noting that the jury was not required to accept the experts' opinions and was entitled to infer that appellant knew his actions were wrong based on other evidence.

After hearing evidence and argument regarding sentencing, the jury recommended a collective sentence of two life terms plus twenty-three years. The trial court imposed that sentence, and this appeal followed.

## II. ANALYSIS

Appellant presents seven assignments of error on appeal, which this Court will consider in turn.

### A. Motion for Grand Jury Information

Appellant first contends that the trial court erred in denying his 2015 motion seeking "grand jury lists and any other information reflecting the name, race, gender, and age of all potential" grand jurors for a five-year period preceding appellant's trial "in order to prepare a

Sixth Amendment Fair Cross-Section constitutional challenge to the Dinwiddie County grand jury composition and selection process." Because a criminal defendant in Virginia is not automatically entitled to grand juror lists and appellant's expansive request implicated recognized juror privacy concerns, the trial court did not abuse its discretion in denying appellant's motion. Moreover, as discussed *infra*, a petit jury's verdict of guilt renders harmless beyond a reasonable doubt any claim of defect in the composition of the grand jury, unless a structural error is shown, such as might arise in a claim of intentional discrimination in violation of the Equal Protection Clause under the Fifth or Fourteenth Amendments. Because appellant asserts no such challenge here, the trial court's decision—even if erroneous—was harmless.

### 1. Standard of Review

Whether to permit examination of a jury list, like other trial management decisions, lies in the sound discretion of the trial court. Archer v. Mayes, 213 Va. 633, 640-41, 194 S.E.2d 707, 712 (1973). Under this deferential standard, the "trial judge's ruling will not be reversed simply because an appellate court disagrees." Thomas v. Commonwealth, 44 Va. App. 741, 753, 607 S.E.2d 738, 743, adopted upon reh'g en banc, 45 Va. App. 811, 613 S.E.2d 870 (2005). Instead, "we consider only whether the record fairly supports the trial court's action." Grattan v. Commonwealth, 278 Va. 602, 620, 685 S.E.2d 634, 644 (2009) (quoting Beck v. Commonwealth, 253 Va. 373, 385, 484 S.E.2d 898, 906 (1997)).

### 2. A Virginia Defendant's Limited Grand Jury Protections

Appellant's assignment of error is not itself a constitutional challenge to the Dinwiddie County grand jury selection procedure. Instead, it merely contends the trial court improperly exercised its discretion in a trial management matter. Nevertheless, a review of a criminal defendant's constitutional and statutory grand jury rights is useful in addressing appellant's argument.

- 14 -

The Fifth Amendment to the United States Constitution enshrines the right to indictment by a grand jury for federal defendants, but the states are subject to no such requirement. Hurtado v. California, 110 U.S. 516, 538 (1884). Even so, Virginia has adopted a grand jury procedure by statute. Code § 19.2-217 provides in part that "no person shall be put upon trial for any felony, unless an indictment or presentment shall have first been found or made by a grand jury in a court of competent jurisdiction."

A Virginia felony defendant's grand jury right, however, is more limited than that of a federal criminal defendant. It is subject to waiver, procedural rather than jurisdictional in nature, and is "purely a statutory requirement . . . not predicated upon any guarantee or provision found in the Constitution of Virginia." Scales v. Commonwealth, 214 Va. 728, 730, 204 S.E.2d 273, 276 (1974) (citing former Code § 19.1-162, the predecessor statute of Code § 19.2-217); Triplett v. Commonwealth, 212 Va. 649, 651, 186 S.E.2d 16, 17 (1972) ("[T]he requirement for indictment is not jurisdictional and constitutionally imposed but is only statutory and procedural."); Cunningham v. Hayes, 204 Va. 851, 854, 134 S.E.2d 271, 274 (1964) ("In Virginia there is no constitutional requirement that prosecutions for felonies be by indictment. The requirement is merely statutory and may be waived by the accused."); Council v. Smyth, 201 Va. 135, 139, 109 S.E.2d 116, 119 (1959) ("Since a person charged with a felony may waive indictment by a grand jury and elect to be tried on a warrant or information, the requirement of an indictment is not jurisdictional."). Further, any errors at the grand jury stage are generally ameliorated by conviction at the trial stage. See Diehl v. Commonwealth, 9 Va. App. 191, 196, 385 S.E.2d 228, 231 (1989) ("[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt . . . [and] any error in the grand jury

proceeding connected with the charging decision was harmless beyond a reasonable doubt." (quoting United States v. Mechanik, 475 U.S. 66, 70 (1986))).

But Virginia's grand jury procedures, like those of all states, remain subject to certain constitutional minimums. See Rose v. Mitchell, 443 U.S. 545, 563 (1979) ("Federal habeas review is necessary to ensure that constitutional defects in the state judiciary's grand jury selection procedure are not overlooked by the very state judges who operate that system."). Although most errors, including constitutional errors, are subject to harmless error review, structural constitutional errors require automatic reversal because they "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair.'" Neder v. United States, 527 U.S. 1, 8 (1999) (quoting Rose v. Clark, 478 U.S. 570, 577-78 (1986)). The United States Supreme Court has held that intentional racial discrimination in grand jury selection in violation of the Fifth or Fourteenth Amendment Equal Protection Clause is such a structural error. Vasquez v. Hillery, 474 U.S. 254, 263-64 (1986) ("[D]iscrimination in the grand jury undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review. . . . Once having found discrimination in the selection of a grand jury, we simply cannot know that the need to indict would have been assessed in the same way by a grand jury properly constituted. The overriding imperative to eliminate this systemic flaw in the charging process, as well as the difficulty of assessing its effect on any given defendant, requires our continued adherence to a rule of mandatory reversal.").

The Sixth Amendment provides a separate basis for challenging jury selection and composition. From that Amendment's guarantee of trial "by an impartial jury of the State and district wherein the crime shall have been committed," the Supreme Court has derived a

requirement that trial juries represent a fair cross-section of the community.  Taylor v. Louisiana, 419 U.S. 522, 530 (1975).  This requirement, however, may not apply to state grand juries.  See Campbell v. Louisiana, 523 U.S. 392, 403 (1998) (declining to rule on whether state grand jury selection procedures are subject to Sixth Amendment fair-cross-section challenges).

To establish a *prima facie* fair-cross-section violation, a defendant must show:

> (1)  that the group alleged to be excluded is a "distinctive" group in the community;
> (2)  that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
> (3)  that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren v. Missouri, 439 U.S. 357, 364 (1979).  Crucially absent from this test is any showing of *intent* to discriminate.  Indeed, the Duren majority intended a fair-cross-section challenge to lie regardless of proof of intent.  See id. at 368 n.26 (noting that discriminatory purpose constituted an "essential element" of equal protection challenges, whereas "in Sixth Amendment fair-cross-section cases, systematic disproportion *itself* demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section" (emphasis added)); see also id. at 371 (Rehnquist, J., dissenting) (observing that the difference between equal protection and fair-cross-section challenges "apparently lies in the fact, among others, that under equal protection analysis prima facie challenges are rebuttable by proof of absence of intent to discriminate, while under Sixth Amendment analysis intent is irrelevant, but the State may show 'adequate justification' for the disproportionate representation of the classes being compared").

### 3.  Appellant's Request for Grand Jury Information

Under what circumstances a criminal defendant is entitled to the information used to select grand jurors in order to prepare a Sixth Amendment fair-cross-section challenge is a question of first impression in Virginia.  Appellant urges this Court to adopt the procedure

identified by the Supreme Court of Virginia in Prieto v. Commonwealth, 283 Va. 149, 721 S.E.2d 484 (2012), for obtaining information used to select petit jurors. In that case, the Court held that good cause exists to provide a defendant with the petit jury list from which his venire would be selected in order to investigate potential constitutional challenges. Id. at 185, 721 S.E.2d at 505. The Court recognized that lists for additional years may be useful for establishing a constitutional challenge, but that a defendant would be entitled to them only after establishing a "constitutionally significant underrepresentation of a distinctive group in the venire from which his jury would be selected" using the initial list. Id. at 185, 721 S.E.2d at 506.

The Preito Court's reasoning is distinguishable in the grand jury context. As an initial matter, no authoritative tribunal has yet held that a defendant may make a Sixth Amendment fair-cross-section challenge against a state's grand jury procedures. See Campbell, 523 U.S. at 403. Additionally, the Prieto Court itself was presented with a request for grand jury information, but held that the request was procedurally defaulted because it was made after the defendant entered a plea. The Court ruled without opining, even in dicta, whether the same petit jury procedures would apply in the grand jury context. Prieto, 283 Va. at 181-84, 721 S.E.2d at 503-05.

Moreover, appellant's motion in the instant case sought disclosure of five years of grand jury information, not merely the year in which he was indicted. He made no effort to narrow this request either at trial or in his assignment of error on appeal. Virginia decisions, Prieto among them, have consistently emphasized that jury lists are sensitive documents and their disclosure raises serious concerns about citizen privacy. Archer, 213 Va. at 641, 194 S.E.2d at 712 (noting that even after a showing of good cause, inspection of jury lists should occur "only under the 'watchful eye of the court'"); see also Prieto, 283 Va. at 185, 721 S.E.2d at 505 ("The disclosure of an expired jury list does not raise the same tampering or harassment concerns that the

disclosure of a current jury list does, but it still raises privacy concerns. A jury list contains sensitive information that should be protected. We thus believe that a good-cause standard is appropriate for the release of both a current and expired jury list."). Because "[e]xposure of the list to the public could lead to tampering with and harassment of potential jurors and seriously affect their impartiality and the proper administration of justice," courts must exercise caution in permitting their disclosure. Archer, 213 Va. at 641, 194 S.E.2d at 712.

Lacking any binding authority requiring it to disclose the requested information to appellant, the trial court assessed appellant's motion in light of these known principles: appellant had no constitutional or statutory entitlement to the information and his broad request implicated recognized citizen privacy considerations. Given these considerations, this Court holds that the trial court did not abuse its discretion in denying appellant's motion for five years of grand jury information.

Even assuming that the trial court did err in denying appellant's motion, such error was harmless. Because Sixth Amendment fair-cross-section challenges, unlike Equal Protection Clause challenges, do not require or even contemplate intentional discrimination, see Duren, 439 U.S. at 368 n.26, they are not among the "very limited class of cases" in which error is structural. Neder, 527 U.S. at 8 (quoting Johnson v. United States, 520 U.S. 461, 468 (1997)). As such, the failure to provide a defendant with information used to select grand juries—even if it were error—would be subject to harmless error review like any other nonstructural error, even those of a constitutional dimension. Id. Accordingly, because the petit jury ultimately convicted appellant of all charges, the trial court's denial of appellant's motion was inescapably harmless. The trial jury's guilty verdict not only means that probable cause existed to believe appellant was guilty as charged, but that he was in fact guilty of the charges beyond a reasonable doubt. See Diehl, 9 Va. App. at 196, 385 S.E.2d at 231.

B.  Motion to Change Venue

In his second assignment of error, appellant contends that the trial court abused its discretion by denying his repeated motions to change venue.  Appellant specifically cites the intensive media coverage of the crime, the close-knit Dinwiddie community's collective mourning of Walker, and the difficulty of seating a jury to support his argument that he could not receive a fair trial in Dinwiddie County.  Because appellant failed to overcome the presumption that he would receive a fair trial in the jurisdiction in which the crime occurred, this Court holds that the trial court did not err in denying his motions.

1.  Standard of Review

"Change of venue is within the sound discretion of the trial court, and refusal to grant it will not constitute reversible error unless the record affirmatively shows an abuse of discretion." Stockton v. Commonwealth, 227 Va. 124, 137, 314 S.E.2d 371, 379 (1984).  In reviewing motions to change venue, appellate courts begin with the presumption that the defendant can receive a fair trial from the citizens of the jurisdiction where the offense occurred.  Teleguz v. Commonwealth, 273 Va. 458, 477, 643 S.E.2d 708, 720 (2007); Thomas v. Commonwealth, 263 Va. 216, 230, 559 S.E.2d 652, 659-60 (2002).  The defendant bears the burden of overcoming this presumption by "clearly showing 'that there is such a widespread feeling of prejudice on the part of the citizenry as will be reasonably certain to prevent a fair and impartial trial.'"  Stockton, 227 Va. at 137, 314 S.E.2d at 280 (quoting Coppola v. Commonwealth, 220 Va. 243, 248, 257 S.E.2d 797, 801 (1979)).

2.  Merits

In determining whether community prejudice against the defendant is sufficiently pervasive to preclude a fair trial and justify a change in venue, the primary inquiry is the ease with which an impartial jury can be selected.  Thomas, 263 Va. at 231, 559 S.E.2d at 660.  "This

is so because the relative ease of seating an impartial jury negates the existence of the 'widespread prejudice' which a criminal defendant must show to justify a change in venue." Buchanan v. Commonwealth, 238 Va. 389, 407, 384 S.E.2d 757, 767 (1989) (quoting Pope v. Commonwealth, 234 Va. 114, 120, 360 S.E.2d 352, 356 (1987)).  Moreover, "[j]urors are not required to be totally ignorant of the facts and issues in a case.  Consequently, the mere showing of extensive publicity or general knowledge of a crime or of the accused, including his criminal record, is not enough to justify a change of venue."  Id. at 406-07, 384 S.E.2d at 767 (citations omitted).  In fact, many of the most qualified jurors will know enough about the case to have formed some preliminary opinions:

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Irvin v. Dowd, 366 U.S. 717, 722-23 (1961).

Nevertheless, the volume and timing of publicity, as well as whether that publicity is factually accurate, temperate, and noninflammatory remain pertinent concerns in assessing whether a change in venue was appropriately denied.  Buchanan, 238 Va. at 407, 384 S.E.2d at 767; Thomas, 263 Va. at 230-31, 559 S.E.2d at 660.  Where media coverage, though voluminous, is largely factual and unprovocative, it will not justify a venue change.  See Stockton, 227 Va. at 137, 314 S.E.2d at 380 (observing that despite the volume of press coverage, "the articles, in the main, were factual in nature" in upholding denial of venue change); Buchanan, 238 Va. at 407, 384 S.E.2d at 767 (affirming denial of venue change in part because

"the publicity was accurate and noninflammatory"); LeVasseur v. Commonwealth, 225 Va. 564, 578, 304 S.E.2d 644, 651 (1983) (holding lower court did not abuse its discretion in denying venue change despite extensive publicity because "[t]he news articles tendered to the court simply reported the facts, which are shocking in themselves" and "were not inflammatory").

### a. Nature of Coverage

There is no dispute that this case received substantial media attention. Of course, "sheer volume of publicity is not alone sufficient to justify a change of venue." LeVasseur, 225 Va. at 578, 304 S.E.2d at 651. On brief, appellant alleges only two inaccuracies out of the hundreds of pages of media coverage included in the record, neither of which are actually inaccurate. The first related to statements appellant made during his initial court appearance that suggested he was aware of his guilt and accepted that he might receive the death penalty. As discussed further *infra*, testimony that appellant in fact stated "I'm guilty. Go ahead and stick the needle in my arm," in open court was admitted into evidence at appellant's trial, thereby supporting the accuracy of the news accounts. The second alleged inaccuracy was a television report offering a speculative account of Walker's death in which the newscaster suggested that Walker pulled over and asked appellant, "Can I help you, brother?" Viewing the evidence presented at trial in the light most favorable to the Commonwealth, see Williams, 49 Va. App. at 442, 642 S.E.2d at 296, the only logical inference from the fact Walker stopped his police cruiser near appellant's stationary vehicle on the interstate shoulder is that Walker planned to assist appellant. Moreover, appellant's own opening statement acknowledged this obvious inference, including the observation, "Trooper Walker pulls up next to [appellant], most likely to see if he was okay," in a narrative of the events leading up to the shooting. Accordingly, the newscaster's implication was accurate regardless of the precise words used in the broadcast.

- 22 -

Appellant further contends that the media coverage was inflammatory, emphasizing the extensive coverage of "Walker's extraordinary local standing and memorialization" as well as appellant's criminal history and legal team. Appellant, however, cites no binding precedent holding that factual reporting of a victim's life and community standing is inflammatory for purposes of a change-of-venue inquiry, nor is this Court aware of such precedent. Further, media reports covering a criminal defendant's past conduct is not *per se* inflammatory. See Thomas, 263 Va. at 231, 559 S.E.2d at 660 ("[P]ublication of matters concerning the crime, the accused's prior criminal record, and even a confession of the accused, if factually accurate and non-inflammatory, is not improper and will not alone support a change of venue."). The threshold for establishing that a factual report of a defendant's history is inflammatory is a high one. For instance, the Supreme Court has upheld denial of a venue change even where media reports labeled the defendant "Surry's Public Enemy No. 1," discussed his "life of crime" and described his involvement in a variety of serious offenses, and even compared him to Charles Manson. Stockton, 227 Va. at 135-36, 314 S.E.2d at 379. Appellant cites no coverage sufficiently sensational to be deemed inflammatory; instead, the media reports, "in the main, were factual in nature." Id. at 137, 314 S.E.2d at 380. Finally, appellant contends that certain reports regarding statements by the trial court and prosecution concerning defense counsel were inflammatory; a review of the record indicates that the reports accurately set forth those statements.

The timing of the publicity in this case further supports the trial court's denial of a venue change. "On a change of venue motion, the court must look to the conditions at the time of the trial, not to the conditions at the time of the crime." Greenfield v. Commonwealth, 214 Va. 710, 717, 204 S.E.2d 414, 420 (1974). Appellant contends that the media continued its extensive coverage of the case through trial. Appellant, however, cites few reports between the initial

- 23 -

frenzy of coverage in March 2013, when the crime occurred, and July 2016, when the trial began. In fact, the lull in coverage was a common topic during jury selection. When asked what he had heard about the case, one potential juror replied: "It's been kind of so long, I don't remember, really, a whole lot about it. It was a shooting. . . . It's probably been at least a few years ago." Another similarly stated that he could put aside his opinions based on the prior media reports because they "first came out a while back" and he now had "very little recollection" of them. In Greenfield, the Supreme Court upheld the lower court's denial of a change in venue in part because of the "substantial time difference between the date of the crime, November of 1972 (when most of the press accounts appeared), and the date of the trial, June 13, 1973"—a difference of eight months. 214 Va. at 717, 204 S.E.2d at 420. Because over three years elapsed between the crime and trial in this case, the lull in coverage further supports the trial court's decision to deny appellant's motion.

b. Ease of Jury Selection

Turning to the "critical element" in determining a community's degree of prejudice, Thomas, 263 Va. at 231, 559 S.E.2d at 660, appellant contends that "[s]eating a fair jury in Dinwiddie was an impossible task."

> Measuring the ease of impaneling a jury is an important tool in considering a request for change of venue. It allows the trial court to take into account a cross section of the community so as to understand the pervasiveness of prejudice. It also allows the trial court to keep in mind that justice must not only be fair, it must also be above suspicion, because the more difficult it is to seat a jury, the more likely it is that the public will believe the judicial process to be tainted by prejudice.

Id. at 233, 559 S.E.2d at 661.

Appellant emphasizes the number of jurors questioned and the amount of time it took to qualify the twenty-eight prospective jurors necessary to proceed. He then compares those numbers to figures in Thomas, relying on that case for the proposition that because the selection

- 24 -

process here was more difficult than there, this Court must find that the trial court abused its discretion in denying the motion to change venue. Appellant's reliance on Thomas is misplaced.

At the outset, we note that whether to grant a motion to change venue is not a mathematic calculation based on the number of prospective jurors considered and days of *voir dire*. Instead, as appellant acknowledges on brief, courts considering motions to change venue should look to the "totality of the surrounding facts." Irvin, 366 U.S. at 721. Additionally, Thomas is distinguishable from this case. Contrary to appellant's characterization, the Supreme Court in Thomas did not reverse the lower court because it abused its discretion in denying a motion to change venue. In fact, the Thomas Court did not even reach the abuse-of-discretion question. Instead, it held that

> the trial court erred, as a matter of law, by failing to apply the proper test and failing to consider the necessary factors when making its decision to deny Thomas' motion to change venue. Consequently, because the trial court used an improper legal standard in exercising its discretionary function, we are unable to apply the appellate review standard of abuse of discretion. In light of this holding, the judgment of conviction must be vacated.

263 Va. at 233, 559 S.E.2d at 661. The lower court in Thomas looked exclusively to whether "it had ultimately seated an impartial jury" in denying the motion to change venue; it did not consider the ease of seating a jury. Id. at 232, 559 S.E.2d at 661. This, the Supreme Court held, was an improper test. Id. A simple statistical comparison between this case and Thomas is therefore unpersuasive in assessing the ease of jury selection here.

This Court instead looks to the actual selection process in the trial court to determine whether it abused its discretion in denying appellant's motion. The trial court maintained an awareness of the Thomas decision throughout *voir dire*, alluding to it multiple times in its ruling. It recognized that the selection process took six days and that it considered six panels of twenty jurors before arriving at the final pool of twenty-eight jurors. Recognizing that, "on their face,

the percentages look bad," the trial court noted: "I don't think I can approach this mechanically and say if the level of people who know is X percent, then I will automatically grant the motion." Instead, it considered why the selection process took six days and why it was necessary to consider so many jurors. The trial court indicated that it deliberately took a slower, cautious approach to jury selection, including individual questioning of most prospective jurors, because the "multiple considerations" in this case required a "thorough and careful approach." The trial court recognized that it was not "publicity alone" that necessitated a slower *voir dire*, but instead "all the other considerations . . . such as the insanity defense, the fact it is a capital murder case, the questions regarding burden of proof, psychologists, law enforcement, and so forth."

The core issue in the trial below was appellant's insanity defense. Both parties agreed that appellant killed Walker; the controversy was whether appellant was criminally liable for doing so in light of his mental condition. As such, prospective jurors' opinions regarding the insanity defense and comprehension of the burden of proof for that defense were essential considerations during *voir dire*. Similarly, because appellant was charged with capital murder, the trial court had to ensure that the jury was death qualified. These complex concerns bear greater responsibility for the length of jury selection than issues related to the potential partiality of the jury pool. In fact, more prospective jurors were stricken for their views on the death penalty, difficulty understanding the burdens of proof, and other reasons unrelated to prejudice against appellant than those stricken for a fixed opinion of appellant's guilt or familiarity with Walker or his family.

The trial court conducted a deliberate and thoughtful *voir dire* in order to seat an appropriate jury. In each day of selection and with each panel considered, it made appreciable progress toward seating a jury—at no point did the process stall. Most excused prospective jurors were stricken for reasons unrelated to prejudice against appellant or knowledge of the

case.  The trial court appropriately considered the impact of media coverage and applied the correct legal standards to its analysis of appellant's motions.  For those reasons, this Court holds that the trial court did not abuse its discretion in finding that appellant failed to overcome the presumption that he would receive a fair trial in Dinwiddie County and accordingly denying his motions to change venue.

## C.  Motions to Strike Specific Jurors

In his third assignment of error, appellant contends that the trial court erred by limiting questioning during *voir dire* and in denying his motions to strike prospective jurors Delores Palmer and Aaron Whitworth for cause.  Because appellant fails to provide any argument or authority for the proposition that the trial court improperly denied him the opportunity to ask questions during *voir dire*, this Court finds that contention procedurally defaulted under Rule 5A:20(e).  See Rambo v. Commonwealth, 51 Va. App. 418, 426-27, 658 S.E.2d 688, 692 (2008).  Further, because both challenged jurors indicated their impartiality after thorough examination, this Court holds that the trial court did not abuse its discretion in denying appellant's motion to strike them.

### 1.  Standard of Review

"Given that the trial court is 'able to see and hear each member of the venire respond to questions posed' during *voir dire*, it 'is in a superior position to determine whether a prospective juror's responses during *voir dire* indicate that the juror would be prevented from or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath.'" Lovos-Rivas v. Commonwealth, 58 Va. App. 55, 61, 707 S.E.2d 27, 30 (2011) (quoting Townsend v. Commonwealth, 270 Va. 325, 329, 619 S.E.2d 71, 73 (2005)).  "Juror impartiality is a question of fact, and a trial court's decision to seat a juror is entitled to great deference on appeal."  Id.  "Accordingly, the decision to retain or exclude a prospective juror 'will not be

disturbed on appeal unless there has been manifest error amounting to an abuse of discretion.'" Id. at 62, 707 S.E.2d at 30 (quoting Barrett v. Commonwealth, 262 Va. 823, 826, 553 S.E.2d 731, 732 (2001)). In assessing juror impartiality, this Court considers the *voir dire* in its entirety, not merely a challenged juror's isolated statements. See Wolfe v. Commonwealth, 265 Va. 193, 212, 576 S.E.2d 471, 482 (2003).

### 2. Merits

Code § 8.01-385 permits both the court and counsel for either party to examine prospective jurors in order to ascertain, among other things, whether they have formed an opinion or have any bias or prejudice regarding the case. If the court finds that a "juror does not stand indifferent in the cause," then it strikes that juror. Code § 8.01-385. As this Court has repeatedly recognized,

> It is not uncommon to discover during *voir dire* that prospective
> jurors have preconceived notions, opinions, or misconceptions
> about the criminal justice system, criminal trials and procedure, or
> about the particular case. Even though a prospective juror may
> hold preconceived views, opinions, or misconceptions, the test of
> impartiality is whether the venireperson can lay aside the
> preconceived views and render a verdict based solely on the law
> and evidence presented at trial.

Cressell v. Commonwealth, 32 Va. App. 744, 761, 531 S.E.2d 1, 9 (2000) (quoting Griffin v. Commonwealth, 19 Va. App. 619, 621, 454 S.E.2d 363, 364 (1995)). Under this rule, a prospective juror is disqualified if he or she holds "an opinion of that fixed character which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already." Justus v. Commonwealth, 220 Va. 971, 976, 266 S.E.2d 87, 91 (1980) (quoting Slade v. Commonwealth, 155 Va. 1099, 1106, 156 S.E. 388, 391 (1931)). With these principles in mind, we consider the jurors that appellant challenges.

Early in her examination, Palmer stated that she had formed an opinion that "he did it." Immediately thereafter, she clarified that she would "still have to draw [her] own answer" and,

- 28 -

for the remainder of *voir dire* questioning by both parties, steadfastly maintained that she would decide the case based on the evidence presented at trial. The trial court, which was in a superior position to assess Palmer's responses, characterized her as someone who had developed an initial opinion based on prior news reports, but needed to hear the evidence at trial before deciding the case. Whitworth similarly developed an initial opinion about the case based on media reports—he said "[i]t would be hard not to form an opinion" after hearing about the case—but maintained that he would not let the information he had learned affect his judgment. He "realize[d] that media coverage . . . is entertainment" and acknowledged that he did not "know enough about what happened to be able to base a judgment on that." Like Palmer, he recognized that he could not remove what he had learned, but insisted he would decide the case "based solely on evidence presented in the courtroom." And although Whitworth had prior personal experience with mental illness in his family and became emotional while discussing it, he likewise maintained that his personal experiences would not inhibit his ability to consider appellant's case.

On the specific facts of this case, however, this Court need not reach the question whether the prospective jurors' responses evinced such a state of mind as to disqualify them. See Shifflett v. Commonwealth, 221 Va. 760, 771 n.11, 274 S.E.2d 305, 312 n.11 (1981) ("Whether a juror is impartial and stands indifferent to the cause is to be determined in light of the controverted issues."). Any tentative opinions formed by the challenged jurors were that appellant had shot Walker. Crucially, this fact was not in controversy. As appellant concedes, the essential issue in this case was whether appellant was legally insane when he shot Walker. Accordingly, "any previously held opinion that [appellant] fired the gun was irrelevant to a determination of his criminal responsibility for his acts" and "[n]one of the . . . prospective jurors had formed any opinion as to [appellant's] sanity." Id. at 771, 274 S.E.2d at 312. With respect to Whitworth's prior personal experiences with mental health issues in his family, the trial court

carefully assessed Whitworth's answers and properly concluded that "he was sufficiently rehabilitated" to remain in the jury pool. Therefore, because the prospective juror's responses indicated that they had not formed "fixed and decided opinion[s]" about appellant's sanity, the issue upon which his guilt or innocence turned, id., and because they were not otherwise disqualified, this Court holds that the trial court did not err in denying appellant's motions to strike Palmer and Whitworth.

### D. Intent to Interfere with Walker's Official Duties

In his fourth assignment of error, appellant challenges the sufficiency of the evidence of capital murder. Specifically, appellant argues that the Commonwealth failed to prove that he acted with the intent to interfere with Walker's official duties as a Virginia State Police officer. Because the evidence supports the inference that appellant acted with the requisite intent, this Court holds that the trial court did not err by denying appellant's motion to strike the capital murder charge.

### 1. Standard of Review

"When the sufficiency of the evidence is challenged on appeal, this Court 'must affirm the conviction unless it is plainly wrong or without evidence to support it.'" Gerald v. Commonwealth, 68 Va. App. 167, 172, 805 S.E.2d 407, 410 (2017) (quoting Spencer v. City of Norfolk, 271 Va. 460, 463, 628 S.E.2d 356, 358 (2006)). Under this familiar standard of review, "[a]n appellate court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Williams v. Commonwealth, 278 Va. 190, 193, 677 S.E.2d 280, 282 (2009) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. "Additionally, upon appellate review, the evidence and all inferences reasonably deducible therefrom must be examined in the light

most favorable to the Commonwealth, the prevailing party in the trial court.  Any evidence properly admitted at trial is subject to this review."  Commonwealth v. Presley, 256 Va. 465, 467, 507 S.E.2d 72, 72 (1998).

## 2.  Merits

Code § 18.2-31(6) provides, in part, that the "willful, deliberate, and premeditated killing of a law-enforcement officer as defined in § 9.1-101 . . . when such killing is for the purpose of interfering with the performance of his official duties" constitutes capital murder.  The Supreme Court has held that

> the crucial inquiry contemplated by the statute is not whether the officer was in fact engaged at the time he was killed in performing a law enforcement duty but, rather, *whether the killer acted with the purpose of interfering with what he perceived to be an officer's performance of a law enforcement duty.*

Delong v. Commonwealth, 234 Va. 357, 369, 362 S.E.2d 669, 676 (1987) (emphasis added) (quoting Martin v. Commonwealth, 221 Va. 436, 440, 271 S.E.2d 123, 126 (1980)).

"[W]hether the required intent exists is generally a question of fact for the trier of fact."  Nobles v. Commonwealth, 218 Va. 548, 551, 238 S.E.2d 808, 810 (1977).  "Intent in fact is the purpose formed in a person's mind and may be, and frequently is, shown by circumstances."  Becker v. Commonwealth, 64 Va. App. 481, 491, 769 S.E.2d 683, 688 (2015) (quoting Abdo v. Commonwealth, 64 Va. App. 468, 475, 769 S.E.2d 677, 680 (2015)).  "Circumstantial evidence is as acceptable to prove guilt as direct evidence, and in some cases, such as proof of intent or knowledge, it is practically the only method of proof."  Abdo, 64 Va. App. at 476, 769 S.E.2d at 680 (quoting Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980)).  Importantly, the "reasonable inferences to be drawn from proven facts are within the province of the trier of fact."  Robertson v. Commonwealth, 31 Va. App. 814, 820, 525 S.E.2d 640, 643 (2000) (quoting Fleming v. Commonwealth, 13 Va. App. 349, 353, 412 S.E.2d 180, 183 (1991)).

- 31 -

As such, the "fact finder may infer that a person intends the immediate, direct, and necessary consequences of his voluntary acts." Id. (quoting Bell v. Commonwealth, 11 Va. App. 530, 533, 399 S.E.2d 450, 452 (1991)).

The record reveals ample evidence from which the jury may have inferred that appellant acted with the intent to interfere with Walker's performance of his official duties. Walker was in uniform when he pulled over his marked police cruiser with lights activated. All parties acknowledge that the only reasonable explanation for Walker pulling over was to assist appellant on the roadside, an act within a state trooper's official duties. Further, appellant's own words indicate that he knew he attacked and killed a law enforcement officer acting in his official capacity: he recognized that "a police car pulled up beside him on the shoulder" and stated that he "knows [police] procedure" because "police are supposed to pull behind you with lights on and call for backup." His extended gunfight with Moss, who was uniformed and arrived in a marked state police cruiser, provided further evidence from which the jury could infer appellant's intent to interfere.

Appellant concedes that he knew what he was doing; his insanity defense relied solely on the claim that he did not understand the *wrongfulness* of his actions. Both clinical psychologists who examined appellant agreed that appellant was fully aware he had killed an officer in the line of duty. Nelson testified that appellant "repeatedly said" that he knew he was shooting a gun and knew that he "killed a police officer." Nelson additionally acknowledged that appellant had "multiple rational motives for shooting a police officer that day." Boyd agreed that appellant was aware of the nature of his actions and that they constituted a capital offense.

The jury thus had before it evidence that Walker was acting in his official capacity, that appellant knew he was killing a police officer in the line of duty, that he understood killing Walker would necessarily prevent Walker from carrying out his official duties, and that he

undertook that action voluntarily. Because the jury is entitled to draw inferences from the evidence presented, and it further "may infer that a person intends the immediate, direct, and necessary consequences of his voluntary acts," Robertson, 31 Va. App. at 820, 525 S.E.2d at 643, it appropriately found that appellant killed Walker with the intent to interfere with the performance of his official duties. Accordingly, the trial court properly found that sufficient evidence had been presented to submit the issue to the jury and therefore did not err in denying appellant's motion to strike the capital murder charge.

### E. Second-Degree Murder Instruction

In his fifth assignment of error, appellant contends that the trial court erred in denying his proffered instruction on second-degree murder because more than a scintilla of evidence supported a finding that the shooting was not willful, deliberate, or premeditated. Because the evidence presented at trial did not support a second-degree murder instruction, this Court holds that the trial court did not abuse its discretion in denying it.

### 1. Standard of Review

"When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." King v. Commonwealth, 64 Va. App. 580, 583, 770 S.E.2d 214, 216 (2015) (quoting Commonwealth v. Vaughn, 263 Va. 31, 33, 557 S.E.2d 220, 221 (2002)). Jury instructions "are proper only if supported by the evidence," Commonwealth v. Donkor, 256 Va. 443, 445, 507 S.E.2d 75, 76 (1998), and "more than a mere scintilla of evidence" is required, Boone v. Commonwealth, 14 Va. App. 130, 132, 415 S.E.2d 250, 251 (1992). "If any credible evidence in the record supports a proffered instruction . . . failure to give the instruction is reversible error." Id. at 132, 415 S.E.2d at 251; see also Foster v. Commonwealth, 13 Va. App. 380, 383, 412 S.E.2d 198, 200

(1991) ("[A] trial judge may not refuse to grant a proper, proffered instruction if evidence in the record supports the defendant's theory of defense.").

## 2. Merits

Familiar principles govern appellate review of a trial court's refusal of a lesser-included offense instruction in murder cases:

> "We have long recognized that evidence showing a murder 'to have been deliberate, premeditated and willful could be so clear and uncontroverted that a trial court could properly refuse to instruct on the lesser included offenses.' It follows, therefore, that a criminal defendant 'is not entitled to a lesser degree instruction solely because the case is one of murder.'
> A second[-]degree murder instruction is only appropriate where it is supported by evidence. Moreover, the evidence asserted in support of such an instruction 'must amount to more than a scintilla.'"

Porter v. Commonwealth, 276 Va. 203, 241, 661 S.E.2d 415, 434 (2008) (quoting Buchanan, 238 Va. at 409, 384 S.E.2d at 769). In Virginia, there is a presumption that all homicides are second-degree murders. LeVasseur, 255 Va. at 590, 304 S.E.2d at 658. "The presumption of second-degree murder," however, must "yield[] to facts." Id. (quoting Plymale v. Commonwealth, 195 Va. 582, 602, 79 S.E.2d 610, 620 (1954) (Buchanan, J., dissenting)).

In this case, no evidence presented supports a finding that appellant acted without willfulness, deliberation, or premeditation. The evidence instead paints a picture of a prepared actor carrying out a planned attack. Appellant was camouflaged, armed with a powerful hunting rifle, and had with him enough ammunition to kill Walker, shoot at Hales, and still carry on an extended gunfight with Moss. Appellant acted carefully during the gunfight, employing tactics consistent with Virginia State Police training procedures while engaging Moss. He continued to act strategically on retreat by abandoning his firearm and clothing, thus inhibiting the ability of police dogs to track him and similarly reducing the likelihood that another police officer would shoot him. Moreover, appellant ambushed Walker without provocation. Walker never had the

- 34 -

chance to put his cruiser in park, much less exit and draw his service sidearm. Appellant then followed Walker's cruiser as it rolled into the woods where he was still firing at Walker's body.

Appellant's own evidence, even viewed in the light most favorable to him, established that he acted with premeditation. The essence of the psychiatric testimony he offered only challenged his ability to distinguish right from wrong. Accordingly, because there was not more than a scintilla of evidence to justify an instruction on second-degree murder, this Court holds that the trial court did not err in refusing appellant's proffered instruction for that reason.

### F. Statement at Appellant's Arraignment

In appellant's sixth assignment of error, he contends that the trial court erred by admitting his statement, "I'm guilty. Go ahead and stick a needle in my arm," made during his arraignment because the Commonwealth failed to disclose it during discovery and it constituted improper rebuttal evidence. Because the statement was not subject to discovery disclosure and was relevant to contradict appellant's argument that he did not know his actions were wrong, this Court affirms the trial court's ruling.

### 1. Standard of Review

"Appellate courts review evidentiary rulings under an abuse of discretion standard." Boone v. Commonwealth, 63 Va. App. 383, 388, 758 S.E.2d 72, 75 (2014). To the extent this inquiry requires interpretation of statutes or rules of court, this Court reviews such questions of law *de novo*. Woodard v. Commonwealth, 287 Va. 276, 280, 754 S.E.2d 309, 311 (2014).

### 2. Merits

Appellant first argues that the Commonwealth was required to provide notice of the statement during discovery pursuant to Rule 3A:11 and the discovery order. Both the rule and order required the Commonwealth to disclose to defense counsel all "written or recorded statements made by the accused, or copies thereof, or the substance of any oral statements or

- 35 -

confessions made by the accused to any law enforcement officer." Rule 3A:11(b)(1). If a statute or rule is unambiguous, this Court will "apply the plain meaning of the language appearing" therein. Harvey v. Commonwealth, 65 Va. App. 280, 285, 777 S.E.2d 231, 234 (2015) (quoting Commonwealth v. Amos, 287 Va. 301, 305-06, 754 S.E.2d 304, 306-07 (2014)). "The plain, obvious, and rational meaning of a statute is always preferred to any curious, narrow or strained construction." Gilliam v. Commonwealth, 21 Va. App. 519, 522-23, 465 S.E.2d 592, 594 (1996) (quoting Branch v. Commonwealth, 14 Va. App. 836, 839, 419 S.E.2d 422, 424 (1992)).

In this case, both Rule 3A:11(b)(1) and the order required prior disclosure of "any oral statements" made "to" a law enforcement officer. Although the order contains only the phrase "oral statements," Rule 3A:11(b)(1) includes beside it the phrase "or confessions." This Court has consistently recognized and applied the canon of statutory construction known as "*noscitur a sociis*." "*Noscitur a sociis* is the principle that 'a word is known by the company it keeps.' It 'provides that the meaning of a word takes color and expression from the purport of the entire phrase of which it is a part, and it must be read in harmony with its context.'" Edwards v. Commonwealth, 53 Va. App. 402, 411, 672 S.E.2d 894, 898 (2009) (*en banc*) (first quoting S.D. Warren Co. v. Maine Bd. of Envtl. Prot., 547 U.S. 370, 378 (2006), then quoting Turner v. Commonwealth, 226 Va. 456, 460, 309 S.E.2d 337, 339 (1983)). As such, the fact that Rule 3A:11(b)(1) provides for disclosure of a defendant's "oral statements or confessions" he or she makes "to a law enforcement officer" indicates that the rule contemplates disclosure only of those statements made either in response to police questions or at least volunteered to an officer, but not those an officer merely happens to hear.

In this case, Mann testified that he heard appellant make the statement during an arraignment in open court. Appellant did not make the statement in response to a question from Mann; he was not even speaking to Mann when he made it. Mann was simply present in the

public courtroom and heard what appellant said. To accept appellant's reading of the rule would require this Court to mandate disclosure of any oral statements made *within hearing* of a law enforcement officer, drastically expanding the Commonwealth's disclosure duties beyond the rule's plain meaning. This Court declines to do so. The Commonwealth was not required, during discovery, to provide notice of appellant's statement, and the trial court did not err in dismissing appellant's argument to that effect.

Appellant alternatively contends that the statement was improperly admitted during the Commonwealth's rebuttal case because it was consistent with the defense evidence and therefore irrelevant. The crux of the defense case was to establish that although appellant knew what he was doing, he did not appreciate that his actions were wrong and was therefore insane. The Commonwealth introduced the statement in order to rebut that argument. All relevant evidence is generally admissible, Va. R. Evid. 2:402, and "evidence having *any* tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence" is relevant, Va. R. Evid. 2:401 (emphasis added). Appellant's statement at arraignment permitted the inference that, because he was conscious of guilt and accepted the possibility of punishment for what he had done, he knew his actions were wrong. Because the statement thus had at least some tendency to prove that appellant realized his actions were wrong, the trial court did not abuse its discretion in admitting the statement.

### 3. Harmless Error

Even if the trial court erred in admitting the statement, that error was harmless. "No trial is perfect, and error will at times creep in." Lavinder v. Commonwealth, 12 Va. App. 1003, 1009, 407 S.E.2d 910, 913 (1991) (*en banc*) (quoting Parsons v. Commonwealth, 154 Va. 832, 852, 152 S.E. 547, 554 (1930)). "In Virginia, non-constitutional error is harmless 'when it plainly appears from the record and the evidence given at the trial that the parties have had a fair

trial on the merits and substantial justice has been reached.'" Id. at 1005-06, 407 S.E.2d at 911

(quoting Code § 8.01-678). "In a criminal case, it is implicit that, in order to determine whether

there has been 'a fair trial on the merits' and whether 'substantial justice has been reached,' a

reviewing court must decide whether the alleged error substantially influenced the jury." Clay v.

Commonwealth, 262 Va. 253, 259, 546 S.E.2d 728, 731 (2001) (quoting Code § 8.01-678). "An

error does not affect a verdict if a reviewing court can conclude, without usurping the jury's fact

finding function, that, had the error not occurred, the verdict would have been the same."

Lavinder, 12 Va. App. at 1006, 407 S.E.2d at 911. Appellant acknowledged that, if admitted, the

statement "would be cumulative rather than rebutting anything." In fact, appellant offered at trial

several of his other statements demonstrating his awareness that execution was a potential

punishment for his action. Because admission of the statement was, by appellant's own

admission, merely "cumulative," any error in admitting it was harmless.

### G. Motion to Set Aside the Verdict

In his final assignment of error, appellant contends that the trial court erred in denying his

motion to set aside the verdict because no evidence contradicted the defense expert testimony

that appellant was legally insane at the time of the offense. Because the jury was free to reject

appellant's evidence and find that he failed to prove his insanity defense, this Court holds that

the trial court did not err in denying the motion.

### 1. Standard of Review

This Court "will reverse a trial court's refusal to set aside a jury verdict only if that

verdict was 'plainly wrong or without evidence to support it.'" Banks v. Commonwealth, 67

Va. App. 273, 288, 795 S.E.2d 908, 915 (2017) (quoting Code § 8.01-680). "If there is evidence

to support the conviction[], the reviewing court is not permitted to substitute its own judgment,

even if its opinion might differ from the conclusions reached by the finder of fact at the trial."

Clark v. Commonwealth, 279 Va. 636, 641, 691 S.E.2d 786, 788 (2010) (quoting

Commonwealth v. Jenkins, 255 Va. 516, 520, 499 S.E.2d 263, 265 (1998)).  On review of a

sufficiency challenge based on a motion to set aside the jury's verdict, the key issue is "whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt."  Maxwell v.

Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) (quoting Jackson, 443 U.S. at

319).

## 2.  Merits

"In Virginia, unlike many jurisdictions, insanity is an affirmative defense that the

defendant must establish to the satisfaction of the fact finder."  Shifflett, 221 Va. at 769, 274

S.E.2d at 310.  The defendant bears the burden of proving the defense by a preponderance of the

evidence.  White v. Commonwealth, 46 Va. App. 123, 129, 616 S.E.2d 49, 52 (2005) (*en banc*);

see also Taylor v. Commonwealth, 208 Va. 316, 322, 157 S.E.2d 185, 189-90 (1967) ("In

Virginia, every man is presumed to be sane until the contrary is made to appear and when

insanity is relied upon as a defense in a criminal prosecution, it must be proved by the defendant

to the satisfaction of the jury.  This does not shift the ultimate burden of proof which rests upon

the Commonwealth to prove the commission of the alleged offense beyond a reasonable

doubt.").

The test for insanity in Virginia is the M'Naghten test stated in the disjunctive:

> "[I]t must be clearly proved that, at the time of the committing of
> the act, the party accused was labouring under such a defect of
> reason, from disease of the mind, as not to know the nature and
> quality of the act he was doing; or, if he did know it, that he did not
> know he was doing what was wrong."

Price v. Commonwealth, 228 Va. 452, 457, 323 S.E.2d 106, 109 (1984) (quoting M'Naghten's

Case, 10 Cl. & F. 200, 210, 8 Eng. Rep. 718, 722-23 (1843)).  Appellant contends that he proved

his insanity under this test as a matter of law because there were "no factual disputes about the defendant's sanity." This argument mischaracterizes the evidence. Although the Commonwealth did not present expert testimony about appellant's mental health, it provided evidence that appellant was both aware of his actions in killing Walker and knew that what he did was wrong. The Commonwealth also thoroughly cross-examined both defense experts, highlighting weaknesses in their evaluation methodologies. In doing so, the experts conceded that appellant had "multiple rational motives for shooting a police officer" and that "several of [his] actions pointed away from insanity . . . and towards an awareness that his actions were legally wrong."

Once the Commonwealth has adduced proof that "the accused committed the act, it is not sufficient for the accused to raise a reasonable doubt as to his sanity; he must go one step further and prove to the satisfaction of the jury that he was insane at the time of the commission of the act." Wessells v. Commonwealth, 164 Va. 664, 673, 180 S.E. 419, 422 (1935). The jury was free to reject appellant's evidence and find that he failed to prove his insanity defense. Because its fact finding was not plainly wrong or without evidence to support it, the trial court did not err in refusing to set aside the jury's verdict.

III. CONCLUSION

For the foregoing reasons, this Court affirms appellant's convictions.

Affirmed.