UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:    Judges Huff, Athey and Fulton
Argued by videoconference


DAVID SHELTON HOLT

                MEMORANDUM OPINION* BY
v.  Record No. 0947-21-2     JUDGE GLEN A. HUFF
                  APRIL 19, 2022
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HALIFAX COUNTY
Kimberley S. White, Judge

John A. Terry (Bagwell & Bagwell, PC, on brief), for appellant.

Rosemary V. Bourne, Senior Assistant Attorney General (Mark R.
Herring,[1] Attorney General, on brief), for appellee.


David Shelton Holt ("appellant") appeals his convictions, following a bench trial, on one

count of malicious wounding and one count of strangulation, in violation of Code §§ 18.2-51 and

18.2-51.6, respectively. Appellant asserts that the Halifax County Circuit Court (the "trial court")

erred in convicting him because the evidence did not establish that he acted with malice and the

necessary intent to maim, disfigure, disable, or kill. Appellant further asserts the evidence was

insufficient to prove that the strangulation caused a wounding or bodily injury to the victim. This

Court disagrees and affirms his convictions.

BACKGROUND

On appeal, this Court "review[s] the evidence in the light most favorable to the

Commonwealth," the prevailing party at trial. *Clanton v. Commonwealth*, 53 Va. App. 561, 564

---

\* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

(2009) (*en banc*) (quotation marks omitted). In doing so, this Court "discard[s] the evidence of the accused in conflict with that of the Commonwealth, and regard[s] as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." *Kelly v. Commonwealth*, 41 Va. App. 250, 254 (2003) (*en banc*) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

On January 23, 2020, Cody Wilson left his house in Halifax, Virginia, sometime after 10:00 p.m. As Wilson approached the intersection of Mountain Road and Swain Road, he encountered a sports utility vehicle (SUV) that slowed to a stop in the middle of the road. The SUV's driver, Karen Clay, got out of the car and stumbled onto the road. Wilson noticed that Clay had blood on her forehead and looked dazed. He rolled down his window and heard Clay say, "[H]elp me, I've been beaten, help me." Wilson called 911 and requested help for Clay.

After stabilizing Clay, Wilson turned on the hazard lights for both his and Clay's vehicles. While inside Clay's vehicle, Wilson saw that Clay's phone, which lay on the seat, was receiving a call from someone named David. While the pair waited for help to arrive, Clay "seemed like she was in and out of consciousness, that she . . . couldn't really comprehend much of what [Wilson] was saying . . . [and] she was crying." At some points, Wilson thought Clay was hyperventilating because her breathing was erratic.

Corporal Stanley Britton, Jr., Deputy Deandre Clark, and Sergeant Joey Adams of the Halifax County Sheriff's Office reported to the scene in response to Wilson's 911 call. When Sergeant Adams arrived, he saw Clay "kneeling down, . . . balled up in a knot and . . . rocking back and forth, real disoriented." Corporal Britton, a twenty-six-year law enforcement veteran, noted that Clay appeared to be "in a state of mind that [he] had never seen before." Each officer noticed Clay had difficulty breathing and had blood coming from a wound over her left eye. Deputy Clark testified that he "felt like [Clay] didn't want to be in a male's presence because every time [he'd] try

to talk to her she would look away from [him]." Because Clay was visibly distraught and unable to communicate with the sheriffs, they ran the tag on Clay's vehicle. The vehicle was registered to an address on Hummingbird Lane. Clay's sister and parents arrived soon after; they confirmed Clay's identity and where she lived, and also informed the officers that Clay's ex-boyfriend lived at Hummingbird Lane.

Shortly after 11:00 p.m., Virginia State Trooper Buzetta stopped at the scene after she noticed the blue lights of law enforcement vehicles. When Trooper Buzetta arrived at the scene she saw Deputy Clark sitting in the roadway with Clay. Clay had injuries to her face and was bloodied and in-and-out of consciousness. Trooper Buzetta testified that Clay's hair was matted with blood and "[e]ach time a male's voice would speak Ms. Clay would tense up, her eyes would open. She would tremble. Her eyes would get large. Her pupils would dilate. She would . . . act scared." According to Trooper Buzetta, based on her training and experience, Clay was having "a fear reaction."

When Trooper Buzetta approached, however, Clay calmed down and her body relaxed. With Trooper Buzetta's help, the officers received Clay's permission to view her recent text messages and phone calls. When asked if appellant had done this to her, Clay nodded in response.

Once the officers established Clay likely came from Hummingbird Lane, Corporal Britton, Deputy Clark, and Sergeant Adams went to that address to investigate. They knocked on the door and after several minutes, appellant answered. Appellant appeared wearing only boxer shorts, and the officers detected the odor of alcohol when he opened the door. Each officer noticed a red mark on appellant's hand.

After the officers entered, they placed appellant in handcuffs and read him his *Miranda*[2] rights. Appellant asked if he could get clothes from his bedroom, and the officers agreed. On the

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

way to the bedroom, Sergeant Adams saw what appeared to be blood in an open trash can. Corporal Britton pointed out "blood splatter on the stove, the cabinets, and floor" to Deputy Clark. While Sergeant Adams assisted appellant in getting dressed, Corporal Britton and Deputy Clark took pictures of the home.

In the bedroom, appellant indicated he wanted his blue jeans. Sergeant Adams examined the jeans for items in the pockets and saw what appeared to be blood on the pants. When asked about the blood on his pants, appellant first said it could have happened at work but later said it could be from a nosebleed. Appellant then asked for his white shoes. While Sergeant Adams collected the shoes, he noticed a red substance on them that appeared to be blood.

The sheriffs briefly spoke with appellant's teenage son, who stated that he was in his bedroom with headphones on all evening and that he had not had a nosebleed.

After arresting appellant, Corporal Britton visited Clay at the emergency room. Corporal Britton noticed bright redness around her neck and asked her if she had been strangled. Clay responded that she had.

The Commonwealth's expert witness, Nurse Charlotte Gilbert, testified that "[c]ommon signs and symptoms [of strangulation] could be swelling to the neck, bruising, redness, [and] scratch marks." Two days after the attack, Gilbert conducted Clay's forensic examination. She documented injuries to Clay's left eye, chin, jaw, right upper arm, lower back, and left flank. Clay told Gilbert she was experiencing throat pain, had difficulty swallowing and a headache, and was in-and-out of consciousness. Gilbert measured Clay's neck so that a comparison could be taken later. Two weeks later, when Clay's neck was measured again., her neck had shrunk in size by half a centimeter. Gilbert testified this was significant because Clay had gained three and a half pounds of weight in the interim.

Clay testified that she left work on the day of the incident and went to appellant's home to hang out. After she arrived, she and appellant began drinking liquor. Clay admitted that she had "maybe two or three drinks" over the course of the evening but testified she was not intoxicated. The next thing Clay remembered was appellant getting angry. He then struck Clay on both sides of her head. Appellant took one of his hands and applied pressure to Clay's neck until she lost consciousness.

When Clay awoke, appellant again grabbed her neck with one hand and applied pressure until she lost consciousness for a second time. After regaining consciousness, Clay saw appellant cleaning up "some red stuff" on the floor. She quickly grabbed her things and left. She drove away unsure of where she was or where she was going. As Clay drove, she tried to call her family. Clay drove until she saw headlights behind her. She then stopped her vehicle, exited, and asked for help. Clay confirmed that appellant was the contact listed as "David" in her phone and that she received text messages from him immediately after the incident. In those messages, appellant accused her of leaving to meet and have relations with other men—men to whom appellant referred by using racist epithets.

Clay testified that her eardrum had ruptured, she had a black eye, and her gash had to be superglued shut. Several days after the attack, Clay's lower back, neck, and face were sore. At trial, Clay had scarring that she did not have before the attack.

Upon the conclusion of the Commonwealth's evidence, appellant moved to strike and specifically argued that the Commonwealth had failed to prove how the injuries to Clay occurred, or that appellant had caused those injuries. Appellant further argued that there was no evidence that the strangulation resulted in the documented injuries. Because Clay, the only witness to the incident, did not remember what occurred that evening, appellant argued the evidence was insufficient to convict him on either indictment. The trial court overruled the motion.

Appellant testified in his own defense. Shortly after Clay arrived at appellant's home, they began to drink liquor. Clay was not feeling well so she went to the bathroom. After fifteen minutes, appellant became worried and went to check on Clay. He found her on the bathroom floor with her face laying in the toilet. He helped her up, and they went back to the kitchen.

According to the appellant, Clay got loud and began tugging on him. He asked her to leave. Appellant remembers that his back was against the refrigerator door, and Clay was in front of him at the kitchen sink but had her back to him. Then Clay quickly turned and took a step toward him. Appellant reflexively swung at Clay and struck her once above the left eye, which immediately began to bleed. Appellant claimed that Clay had stabbed him with a knife before, so when she quickly approached him again, he believed she was going to stab him. Appellant then helped Clay stop the bleeding. At 8:45 p.m. Clay left. Appellant admitted sending Clay text messages to "smooth things over" and encourage her to return to his home. When she never did, he decided to go to bed.

On cross-examination, the appellant admitted Clay had no physical injuries until he struck her and that he was intoxicated that evening.

After the defense rested, appellant incorporated a renewed motion to strike within his closing argument. He argued that his single hit to Clay was not done with malice. When appellant saw Clay move quickly toward him, he believed she was going to attack him with a knife again, so he defended himself. Appellant then immediately aided Clay when the punch resulted in a cut. This, appellant argued, was not malice because he was provoked and offered aid. Appellant also contended that he did not act with the intent to permanently harm Clay because he struck her out of provocation only once and offered her aid.

The trial court made certain factual findings before pronouncing its verdict. Specifically, the trial court found that appellant's testimony was "completely and totally inconsistent with every

other witness who testified" and that the Commonwealth's witnesses were credible. The court further found that Clay was not impaired by alcohol that evening.

The trial court also found that Clay had been struck about the head "more than once. And it was on both sides of the head." She was hit so hard that her eardrum ruptured, and she sustained a cut above her left eye, which resulted in blood that covered her face and matted her hair. The court found that Clay had been strangled twice. Finally, the trial court found that after this "explosive attack," appellant started "sending very vulgar and racist texts to Ms. Clay."

The trial court found appellant guilty of malicious wounding and strangulation. The court sentenced appellant to twenty years for malicious wounding, with twelve years suspended, and five years for strangulation, with three years suspended. This appeal followed.

ANALYSIS

Appellant challenges the sufficiency of the evidence to convict him of malicious wounding and strangulation. "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions

reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

In evaluating the sufficiency of the evidence, this Court notes that "determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)).

## I. Malicious Wounding

Appellant first asserts that the Commonwealth failed to prove beyond a reasonable doubt that his attack on Clay amounted to a malicious wounding. To that end, he makes two distinct yet intertwined sufficiency arguments. First, he contends that the evidence did not establish he acted with the requisite intent to maim, disfigure, disable, or kill. Second, he argues that the evidence at trial was insufficient to support a finding that he acted with malice.

### A. Intent

"If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony." Code § 18.2-51.

"Because intent is a 'state of mind,' it 'may be proved by a person's conduct or by his statements.'" *Fletcher v. Commonwealth*, 72 Va. App. 493, 506 (2020) (quoting *Barrett v. Commonwealth*, 210 Va. 153, 156 (1969)). "[W]hether the required intent exists is generally a question of fact for the trier of fact." *Smith v. Commonwealth*, 72 Va. App. 523, 536 (2020)

(quoting *Brown v. Commonwealth*, 68 Va. App. 746, 787 (2018)). In inferring intent, a factfinder may consider circumstantial evidence, which "is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Fletcher*, 72 Va. App. at 507 (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). But "circumstantial evidence is not to be viewed in isolation," for "[w]hile no single piece of evidence may be sufficient, 'the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Kelly*, 41 Va. App. at 259 (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). Moreover, "the 'fact finder may infer that a person intends the immediate, direct, and necessary consequences of his voluntary acts.'" *Brown*, 68 Va. App. at 788 (quoting *Robertson v. Commonwealth*, 31 Va. App. 814, 820 (2000)).

Here, appellant's actions and Clay's injuries reveal appellant's intent. Appellant hit Clay multiple times in the head and strangled her to the point she twice lost consciousness. He admitted to hitting Clay at least once above her left eye, which created a bleeding gash that had to be medically glued shut and left a scar above her left eye. From the attack, Clay suffered a ruptured eardrum, a black eye, and several bruises on her face and lower back. At a follow up examination two weeks after the initial forensic report, Clay's neck had reduced in size by a half centimeter despite Clay having gained three and a half pounds. The text messages appellant sent to Clay after the incident also shed light on his intent; they contained angry and vulgar accusations that she had left him to meet with other men.

Given the severity of Clay's injuries—especially her resulting loss of consciousness—and the text messages revealing appellant's anger with Clay, "the combined force of [these] concurrent and related circumstances" would allow a rational factfinder to infer that appellant

- 9 -

acted with the intent to maim, disfigure, disable, or kill. *See Kelly*, 41 Va. App. at 259. Thus, this Court will not disturb this finding on appeal.

## B. Malice

"The element in malicious wounding that distinguishes it from unlawful wounding is malice, expressed or implied." *Ramos v. Commonwealth*, 71 Va. App. 150, 162 (2019) (quoting *Hernandez v. Commonwealth*, 15 Va. App. 626, 631 (1993)). "Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will." *Id.* (quoting *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013)). "Whether malice existed is a question for the fact finder." *Robertson*, 31 Va. App. at 823.

Appellant argues that Clay provoked him into hitting her only once. But the trial court found appellant's testimony incredible. And "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan*, 58 Va. App. at 702 (quoting *Marable*, 27 Va. App. at 509-10). Thus, appellant cannot stand on his version of the facts.

Under the accepted evidence and the trial court's factual findings, appellant hit and strangled Clay multiple times—without provocation. And as already noted, his text messages show a degree of anger and ill will toward Clay, which a reasonable factfinder could infer triggered his attack. Consequently, the trial court's finding that appellant acted with malice is not "without evidence to support it" and his argument fails.

## II. Strangulation

Appellant also asserts that the evidence was insufficient to convict him of strangulation. He contends that, because there was no evidence of cuts or bleeding around Clay's neck, the Commonwealth did not prove a strangulation caused any bodily injury to Clay. But appellant is wrong on this point too.

"Any person who, without consent, impedes the blood circulation or respiration of another person by knowingly, intentionally, and unlawfully applying pressure to the neck of such person resulting in the wounding or bodily injury of such person is guilty of strangulation, a Class 6 felony." Code § 18.2-51.6. A bodily injury "includes an act of damage or harm or hurt that relates to the body; is an impairment of a function of a bodily member, organ, or mental faculty; or is an act of impairment of a physical condition." *Ricks v. Commonwealth*, 290 Va. 470, 479 (2015). "To prove a bodily injury, the victim need not experience any observable wounds, cuts, or breaking of the skin. Nor must she offer proof of 'broken bones or bruises.'" *Id.* (quoting *English v. Commonwealth*, 58 Va. App. 711, 719 (2011)). "[I]nternal injuries [also] . . . fall within the scope of Code § 18.2-51.6." *English*, 58 Va. App. at 719; *see also Ricks*, 290 Va. at 478.

The evidence supports the trial court's finding that appellant strangled Clay and that the strangulation caused her bodily injury. Clay testified that appellant had placed his right hand around the middle of her neck and applied pressure. She could feel pain and was unable to breathe. She began to feel dizzy and lightheaded until she blacked out. When Clay regained consciousness, appellant choked her again in the same manner.

And at the hospital, several hours later, Clay's neck was bright red. When Nurse Gilbert documented Clay's injuries two days after the incident, she found Clay had trouble swallowing, felt throat pain, was in-and-out of consciousness, and had a headache. Gilbert testified these symptoms are common signs that one might expect after a strangulation incident. Moreover, when Clay's neck was measured two weeks after the initial exam, her neck had decreased in size by half a centimeter even though she had gained three pounds in that time frame. Based on this evidence, a factfinder could properly find appellant's act of strangling Clay injured her.

CONCLUSION

The trial court's judgment was not plainly wrong or without evidence to support it. The evidence at trial sufficiently proved appellant acted with malice and the requisite intent to maim, disfigure, disable, or kill Clay. Additionally, the evidence supported the trial court's finding that his strangling of Clay caused her bodily harm. Accordingly, this Court affirms appellant's convictions.

*Affirmed.*