COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, AtLee and Callins
Argued by videoconference

UNPUBLISHED

RONALD EDWARD HOLMES, JR.

v.      Record No. 1403-23-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE GLEN A. HUFF
AUGUST 20, 2024

FROM THE CIRCUIT COURT OF LANCASTER COUNTY
R. Michael McKenney, Judge

Charles E. Haden for appellant.

Craig W. Stallard, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

Following a jury trial, the Circuit Court of Lancaster County ("the trial court") convicted

Robert Edward Holmes, Jr. ("appellant") of the rape and forcible sodomy of his stepmother, C.B.[1]

On appeal, appellant seeks reversal of his convictions and argues that the trial court erred in: (1)

denying his motion to strike the evidence as insufficient to prove beyond a reasonable doubt that he

engaged in the alleged sexual acts without C.B.'s consent, (2) denying his motion to strike for cause

a venireperson who admitted to having relatives who had been victims of sexual assault, and (3)

admitting into evidence his letter to the trial court in which he accused his former defense attorney

of "intentional[ly]" acting to "help the Commonwealth." For the reasons explained below, this

Court affirms appellant's convictions.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] In an effort to protect confidentiality, initials are used to identify the victim.

BACKGROUND[2]

In May 2021, appellant was living with his father and stepmother, C.B., in Lancaster County, Virginia, following his release from prison in 2020. To help appellant reenter society, C.B. tried to put him in contact with people who could have a positive influence on him and could serve as positive role models. She arranged for him to perform volunteer work at Interfaith, a service program based at St. Mary's Whitechapel, a local church, every Monday and Wednesday morning. She also arranged for him to do yard work for a couple of her neighborhood friends. She took him with her to yoga classes at Trinity Episcopal Church. Because appellant did not have a driver's license at that time, C.B. drove him to each of these appointments.

Despite C.B.'s efforts, appellant was not receptive to any advice from his family or from Lisa Thomas, a specialist hired by C.B.'s son, Jessie Brubaker, to help assist appellant in reentering society. During a family meeting with Ms. Thomas, appellant was "very cocky" and uncooperative. Whenever C.B. tried to help appellant improve his speech so that he could find a job, he was "very belligerent" and appeared to be "not interested in being better." He also made "unusual" statements that would "terribly" upset C.B., such as "You are sexy, you're so beautiful." Whenever appellant made such statements, C.B. would say, "That's wrong. Stop. I'm your mother, you don't talk to me like that, and it's inappropriate." Appellant would obey for about a week, acting "like he was just rejected," before resuming such statements.

On May 24, 2021, appellant sexually assaulted C.B. as she was getting ready for a clarinet lesson later that afternoon. When C.B. walked upstairs to an alcove where she kept her clarinet,

---

[2] According to familiar principles of appellate review, this Court states the facts "in the light most favorable to the Commonwealth, the prevailing party at trial." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). "In doing so, we discard any of appellant's conflicting evidence and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *McGowan v. Commonwealth*, 72 Va. App. 513, 516 (2020).

appellant was in the adjacent room. Appellant used the adjacent room as his living quarters. C.B.'s husband was taking a shower at the opposite end of the house.

As C.B. began to retrieve her clarinet, appellant called out and informed her that he had received a telephone call advising that he needed to get a COVID test before undergoing his scheduled colonoscopy. C.B. picked up her phone, walked into another room, and leaned against a bed as she typed in her phone and asked appellant for the date of his appointment. Appellant made an unintelligible reply. C.B. did not realize that appellant had come into the room to stand behind her "until he took both of his hands and put them down [her] pants to between [her] legs." C.B. screamed, "Stop it! You need to stop right now!" Despite her protests, appellant did not stop. Appellant sodomized and raped C.B. With his hands still in her pants, appellant forced C.B. to lie down across the bed on her back. He then pulled up her shirt and bra and pulled down her pants and underwear. While forcing C.B. down on the bed, appellant said, "You want me, don't you?" C.B. replied, "No" and kept telling him to stop. She said, "You know[,] I'm your mother. Your father is going to be very upset. This is wrong." Appellant ignored C.B. and refused to stop. Next, he pinned C.B.'s body on the bed and restrained her arms while her legs were hanging over the bed. C.B. became "very afraid he would strangle [her]."

C.B. repeatedly told appellant that she could not engage in intercourse because her vagina was dry. Appellant responded, "I'll take care of that." He restrained C.B.'s arms, spit between her legs, and "put his tongue up in [her] vagina." Afterwards, appellant climbed on top of C.B. and penetrated her vagina with his penis until he ejaculated. C.B. estimated that the entire incident was over "in about a minute."

Immediately thereafter, C.B. dressed, retrieved her clarinet, and tried to go downstairs, but appellant blocked her way. He then repeatedly said, "Call the police now. Why don't you call the police?" Fearing that she would be killed, C.B. told appellant that everyone makes mistakes, God

will forgive him, and she would not tell his father. Appellant then allowed C.B. to go downstairs, change her clothes, and clean herself up.

As promised, C.B. did not tell her husband what had happened because she believed that he would kill appellant. Despite feeling "numb" and "in shock," C.B. knew she had to defuse the situation and "make sure everything was normal." She believed that she needed time to plan how to get appellant out of the house without appellant killing her or her husband. She ultimately decided to proceed with her day as originally planned.

C.B. first drove appellant to St. Mary's Whitechapel Church for his volunteer work at Interfaith. On the way, she stopped at a local fast-food restaurant so appellant could get breakfast. After arriving at the church, C.B. sat in the car with appellant for a few minutes because they had arrived early. Appellant apologized for raping C.B. C.B. told appellant that she believed he raped her to hurt his father. Appellant responded that he really wanted her. While appellant conducted his duties at Interfaith, C.B. visited a nearby thrift store where she called her husband, but he did not answer the phone. She then picked appellant up from Interfaith, drove him over to a neighbors' house so he could do yard work there, and finally went to her clarinet lesson. At no time that day did C.B. tell her music teacher or anyone else with whom she came into contact what had happened with appellant because she "was still formulating a plan of safety to get him out of the house." She was also still "in shock" and feeling "numb," "nauseated," and "confused."

The following day, May 25, 2021, C.B. continued to carry out her planned activities as if everything were normal, starting with driving appellant to yoga class with her. C.B.'s neighbors also attended the yoga class and, afterwards, gave appellant a ride back to their house so he could do more work on their property. Later in the afternoon, appellant called C.B. and told her that he was not feeling well, so she picked him up and brought him back home. C.B. still did not report the rape and sodomy incident from the prior day to anyone because of her "emotions and state of mind and

fear for [her] safety" as well as the safety of her husband and appellant. She still was afraid that appellant would kill her if he suspected that she had told someone about the sexual assault.

On May 26, 2021, however, C.B. started telling other people about the incident. She started by calling her son, Jessie, while she sat in the car with appellant at the church parking lot waiting for the Interfaith program to begin. When Jessie answered the call, C.B. said, "Please pray for me," which was not how she ordinarily began her conversations with him. She then told Jessie that appellant was with her so that her son would not begin asking any probing questions. C.B. and Jessie agreed to talk later outside of appellant's presence.

After appellant entered Interfaith for work, C.B. texted her prayer partner, Mary Strobel, asking if she had time for a prayer call. When Strobel replied affirmatively, C.B. called her and they prayed for roughly ten minutes. When C.B. spoke with Jessie later that day, she "just didn't have the heart to tell [him] [she] had been raped by [her] stepson" even though Jessie was trying to figure out what happened to C.B. She only told him that she was "in a fog." Jessie asked C.B. to call Ms. Thomas, and C.B. promised that she would.

Later that evening, during a telephone call with Ms. Thomas, C.B. admitted that appellant had sexually attacked her two days ago. She asked Ms. Thomas not to tell anybody and to instead help her decide how to get appellant out of her house. Despite C.B.'s request, Ms. Thomas called Jessie and told him that C.B. had reported appellant's sexual assault of her. Jessie immediately booked an early morning flight to travel from Orlando, Florida to Richmond the following day.

On May 27, 2021, after arriving at the Richmond airport, Jessie rented a vehicle and drove directly to the Lancaster County Sheriff's Office to provide the information that Ms. Thomas had shared with him. He then called C.B. and told her that he was in Richmond for a business meeting, and he wanted to take her to dinner. C.B. accepted the invitation, and they

agreed to meet at St. Mary's Whitechapel Church. Upon meeting, C.B. got into Jessie's car and he told her that he was taking her to the Lancaster County Sheriff's Office. He explained that Ms. Thomas had told him what C.B. had reported to her. C.B. began crying and said, "Thank you so much. Thank you."

After filing the police report, C.B. went to the hospital where a sexual assault nurse examiner (SANE), Ashley Balcombe, conducted a forensic examination of C.B. During the exam, Balcombe found an area of red discoloration inside C.B.'s vagina, but she could not determine its cause. She also did not note any bruising or other visible signs of physical injury to C.B. Between the time of the assault and the subsequent SANE examination, however, C.B. had bathed four or five times.

When appellant was arrested for the rape and forcible sodomy of C.B., he was sitting in the car with his father at the Rappahannock General Hospital waiting in line for a COVID test. When his father commented about the approaching police cars, appellant said, "They're here to get me." He had also previously said, while on the way to the hospital, that: "If I ever go back to jail, I'm not going to just roll over. I'm going to fight it."

### Voir Dire of Prospective Jurors

During voir dire for appellant's trial, the trial court asked prospective jurors if any of them knew any reason why they "cannot give a fair and impartial trial to both the Commonwealth and the defendant." All jurors answered "No." The court then asked whether any juror had been a victim of sexual assault or had friends or family members who were victims of sexual assault. The trial court instructed the potential jurors to write down "yes" or "no" on a piece of paper.

Those who responded affirmatively were privately examined by the court away from the rest of the jurors but in the presence of counsel for both appellant and the Commonwealth. Juror No. 4328 stated that, when she was younger, she had two close relatives who had been victims of

sexual assault and "it might, you know, affect my serving." The court then asked, "[s]o you feel your personal experience with family members having been the victims of sexual assault may affect your ability to sit as an unbiased juror?" The juror said yes.

The Commonwealth asked whether the juror could return a verdict of guilty or not guilty depending on the evidence, despite her personal experience, and the juror said yes. Appellant's counsel asked the juror "what happened to your relative could have a bearing for you being able to make a clear decision," and the juror said "yes." The trial court rephrased the question for clarification, stating, "the real question is: Do you believe that the experience of your family members and your memory of that affecting [sic] your ability to sit as an unbiased juror?" The juror said, "I would think I can. . . . I was just trying to be truthful."

Appellant moved to strike Juror No. 4328 for cause, arguing that "[s]he said she would try to be unbias[ed], but I think it's in the middle there." The Commonwealth emphasized that the potential juror could return a verdict of guilty or not guilty, depending on the evidence. The trial court denied appellant's motion, observing that the juror's assertion of her ability to be impartial was made "with [significantly] less hesitation than some of the others who indicated their family member or friends were victims." Appellant later used a peremptory strike to remove Juror No. 4328 from the venire panel.

<u>Trial Proceedings and Appellant's Handwritten Letter to the Court</u>

During the trial itself, C.B. described how appellant had raped and sodomized her. She also identified and explained her thoughts, feelings, and actions during the two days that followed the incident, all of which caused her to delay reporting the incident to anyone. Appellant, on the other hand, denied engaging in any sexual activity with C.B. on May 24, 2021. Instead, he testified that he had consensual sex with her on May 26, 2021, and had four other sexual encounters with her at the Lancaster County house. Appellant admitted that he had 16 prior felony convictions.

- 7 -

C.B. denied being unhappy in her marriage and denied having consensual sex with appellant. Expert witness Ruth Micklem, community manager for the Virginia Sexual and Domestic Violence Action Alliance, noted that she had worked with hundreds of sexual assault victims for 38 years and, in her experience, delayed reporting of a rape by the victim is very common, especially if the perpetrator is not a stranger. She testified that the range of delay can be from hours to years.

On cross-examination of appellant, the Commonwealth introduced appellant's handwritten letter to the trial judge, dated September 21, 2021, and styled "Motion," in which he accused his former defense attorney of "intentional[ly]" acting to "help the Commonwealth."[3] Appellant objected to both the admission of the letter and any cross-examination relating to it. The trial court overruled the objection but limited the scope of inquiry to the issues raised by appellant in his defense.

At the conclusion of all the evidence, appellant renewed the motion to strike that had been raised at the end of the Commonwealth's case-in-chief. He argued that C.B.'s two-day delay in reporting the May 24, 2021 incident and her actions during those days rendered her testimony inherently incredible. The trial court found that C.B.'s testimony was not "inherently untruthful." Accordingly, it ruled that the question of her credibility was one of the issues "squarely within the responsibility of the jury as the fact finders." The trial court denied appellant's motion, and the jury returned a verdict of guilty.

---

[3] Appellant's original appointed attorney removed himself from the case after obtaining new employment as an assistant prosecutor.

ANALYSIS

Appellant alleges that the trial court committed three reversible errors.[4] First, he contends that the trial court erred in denying his renewed motion to strike because C.B.'s testimony was inherently incredible as a matter of law and, therefore, the evidence failed to exclude every reasonable hypothesis of innocence, i.e., that "the sexual activity between [him] and C.[B.] was consensual." Second, he contends that the trial court erred in denying his motion to strike Juror No. 4328 for cause during voir dire because she admitted to having relatives who had been victims of sexual assault and her answers to follow-up questions raised doubts about her ability to serve as an impartial juror. Third, appellant contends that the trial court erred in admitting into evidence his letter to the trial judge in which he accused his former attorney of neglecting to speak with him and "intentional[ly]" acting to "help the Commonwealth" because the letter was irrelevant and prejudicial.

Denial of Motion to Strike the Evidence

"When faced with a challenge to the sufficiency of the evidence, [this Court must] 'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without evidence' to support it." *Crowder v. Commonwealth*, 41 Va. App. 658, 662 (2003) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)). The relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Kelly*, 41 Va. App. at 257 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). "If there is evidence to support the conviction, an appellate

---

[4] Although appellant listed six assignments of error in his statement of assignments of error, he only stated and discussed three in his opening brief. Thus, he has waived the three errors left unaddressed on brief and this Court does not address them further herein. *See* Rule 5A:20(c)(1) ("Only assignments of error listed in the brief will be noticed by this Court.").

court is not permitted to substitute its own judgment for that of the finder of fact, even if the appellate court might have reached a different conclusion" in the first instance. *Conrad v. Commonwealth*, 31 Va. App. 113, 123 (1999) (en banc) (quoting *Presley v. Commonwealth*, 256 Va. 465, 466 (1998)).

"[D]etermining the credibility of witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify." *Maldonado v. Commonwealth*, 70 Va. App. 554, 562 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). In making such determinations, the jury must weigh the relevant factors, such as "the appearance and manner of the witnesses on the stand, their intelligence, their opportunity for knowing the truth and observing the things about which they testify, their interest in the outcome of the case, their bias, and . . . [any] prior inconsistent statements and prior criminal convictions." *Mullis v. Commonwealth*, 3 Va. App. 564, 571 (1987) (citing *Zirkle v. Commonwealth*, 189 Va. 862, 870 (1949)). Therefore, the conclusions of the jury "on issues of witness credibility 'may only be disturbed on appeal if this Court finds that [the witness'] testimony was "inherently incredible, or so contrary to human experience as to render it unworthy of belief."'" *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011) (alteration in original) (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 858 (1991)). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)).

It is well-established that "a conviction for rape and other sexual offenses may be sustained solely upon the uncorroborated testimony of the victim." *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005). "[B]ecause sexual offenses are typically clandestine in nature, seldom

involving witnesses to the offense except the perpetrator and the victim, a requirement of corroboration would result in most sex offenses going unpunished." *Id.* at 88 (quoting *Garland v. Commonwealth*, 8 Va. App. 189, 192 (1989)). Thus, in a rape or forcible sodomy case where the victim's consent is the only factual issue, the trier of fact, whether a judge or a jury, often is in the position of having to determine the sufficiency of the evidence to support a conviction by solely deciding whether the complaining victim or the accused is the more credible witness. *See Willis v. Commonwealth*, 218 Va. 560, 563 (1977) (noting that convictions for crimes of a sexual nature may depend upon the "uncorroborated testimony of a prosecutrix if her evidence is credible, and the guilt of the accused is believed by the [factfinder] beyond a reasonable doubt"). Here, appellant contends that C.B.'s two-day delay in reporting appellant's crimes and her actions during that two-day period rendered her testimony inherently incredible as a matter of law. This Court disagrees. C.B.'s trial testimony cannot reasonably be seen as so manifestly false as to be inherently unreliable in light of (i) C.B.'s explanation of the delay, (ii) expert witness testimony about delayed reporting by victims of sexual assault, and (iii) appellant's incriminating statement to his father before his arrest.

First, this Court has held that longer reporting delays for which the victim or her circumstances provided an explanation were reasonable and, thus, not inherently incredible. *See e.g.*, *Woodard v. Commonwealth*, 19 Va. App. 24, 28 (1994) (holding that the 13-year-old victim's two-month delay in reporting her rape was "explained by and completely consistent with the all too common circumstances surrounding sexual assault . . . —fear of disbelief by others and threat of further harm from the assailant"). Here, C.B. provided a reasonable explanation for why she did not immediately report the sexual assault.

She described the traumatic nature of the event and its immediate effects on her mental state as well as her decision-making on the day of the incident and thereafter. Immediately after

the incident, she was "numb," "nauseated," "confused," and "in shock." Even two days later, she told her son that she was "in a fog." Additionally, C.B. testified that she feared for the safety of everyone in the house. She worried that telling her husband about the sexual assault would result in him killing appellant. And she was also afraid that appellant would kill her and her husband if she reported the sexual assault to anyone else. Thus, despite having various opportunities to report the incident, C.B. determined that she could not do so safely until she figured out a way to get appellant out of her house without risking harm to anyone. A key part of this plan was maintaining a semblance of normalcy so that appellant would not become suspicious before C.B. was ready to make her report. Indeed, even after confiding the details of the assault to Ms. Thomas, C.B. did not seek further assistance from her family or law enforcement until her son took the initiative to drive her to the local sheriff's office.

Second, the testimony of the Commonwealth's expert witness in the area of sexual abuse and domestic violence provided a plausible explanation for C.B.'s delayed report. The expert witness noted that delayed reporting by a rape victim is very common, especially if the perpetrator is not a stranger, and that the range of delay can range from hours to years. Based on this testimony, the jury could have reasonably determined that C.B.'s report of the sexual assault constituted a "recent complaint."

Third, appellant's statement to his father shortly before his arrest—acknowledging that the approaching police cars were there to get him—could be inferred by the jury as evidence of his consciousness of guilt. *See Jones v. Commonwealth*, 279 Va. 52, 57 (2010) ("'consciousness of guilt' generally is applied to affirmative acts[,] . . . which tend to show a person's guilty knowledge of, and participation in, a criminal act"). "In its role of judging witness credibility, the [jury was] entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused [wa]s lying to conceal his guilt." *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018).

"[T]here can be no relief" in this Court if a witness testifies to facts "which, if true, are sufficient" to support the conviction if the factfinder bases its decision "upon that testimony." *Smith v. Commonwealth*, 56 Va. App. 711, 718-19 (2010) (quoting *Swanson v. Commonwealth*, 8 Va. App. 376, 379 (1989)).

Accordingly, C.B.'s explanation for the reporting delay was not inherently unreliable as a matter of law. Thus, the trial court did not err in denying appellant's motion to strike.

<u>Denial of Motion to Strike Juror for Cause[5]</u>

"The striking of any individual potential juror for cause . . . is committed to the sound discretion of the trial court." *Townsend v. Commonwealth*, 270 Va. 325, 329 (2005). Because the trial court is "able to see and hear each member of the venire respond to questions posed" during voir dire, it "is in a superior position to determine whether a prospective juror's responses during voir dire indicate that the juror would be prevented from or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath." *Id.* Thus, "a trial court's ruling on the issue of whether to retain or excuse a prospective juror for cause . . . will not be disturbed on appeal unless there has been manifest error amounting to an abuse of discretion." *Barrett v. Commonwealth*, 262 Va. 823, 826 (2001).

"An abuse of discretion occurs only when 'reasonable jurists' could not disagree as to the proper decision." *Thomas v. Commonwealth*, 62 Va. App. 104, 111 (2013) (quoting *Brandau v. Brandau*, 52 Va. App. 632, 641 (2008)). "This principle necessarily implies that, for some decisions, conscientious jurists could reach different conclusions based on exactly the same

---

[5] "It is the duty of the trial court, through the legal machinery provided for that purpose, to procure an impartial jury to try every case." *Salina v. Commonwealth*, 217 Va. 92, 93 (1976). Therefore, "[t]he court and counsel for either party shall have the right to examine under oath any person who is called as a juror therein." Code § 8.01-358; *see* Rule 3A:14.

facts—yet still remain entirely reasonable." *Id.* (quoting *Hamad v. Hamad*, 61 Va. App. 593, 607 (2013)). A trial court's decision to seat a juror is entitled to great deference on appeal.

In determining whether the trial court should have excluded a prospective juror, the court must consider the "entire voir dire, not just isolated portions." *Juniper*, 271 Va. at 401. "The opinion entertained by a juror, which disqualifies him, is an opinion of that fixed character which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already." *Justus v. Commonwealth*, 220 Va. 971, 976 (1980) (quoting *Slade v. Commonwealth*, 155 Va. 1099, 1106 (1931)). Thus, "the test of impartiality is whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial." *Cressell v. Commonwealth*, 32 Va. App. 744, 761 (2000). If after questioning it appears to the trial court "that the juror does not stand indifferent in the cause, another shall be drawn or called and placed in his stead for the trial of that case." Code § 8.01-358. If a prospective juror "does not stand indifferent to the cause, he is not competent." *Taylor v. Commonwealth*, 67 Va. App. 448, 454 (2017). "If [he] has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice, he is excluded by the law." *Keepers v. Commonwealth*, 72 Va. App. 17, 42 (2020) (quoting *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 60-61 (2011)).

Here, Juror No. 4328 initially stated that having two close relatives who were victims of sexual assault "may affect" her ability to serve as an impartial juror. She admitted that what happened to her relatives could have a bearing on her ability to make a clear decision. But when the court asked Juror No. 4328 if she believed that she could sit as an unbiased juror, she replied, "I think I can." Additionally, when the Commonwealth asked her if she would have the ability to listen to the evidence and, if required by the evidence, return either a verdict of guilty or not guilty, Juror No. 4328 answered affirmatively.

In denying appellant's motion to strike Juror No. 4328 for cause, the court observed that the juror expressed her ability to be impartial "significantly with less hesitation than some of the others who indicated their family member or friends were victims." The trial court thus concluded that Juror No. 4328 answered the Commonwealth's questions with sufficient conviction to remove any doubt about her ability and willingness to serve as an impartial juror. "[T]he trial court must weigh the meaning of the answers given in light of the phrasing of the questions posed, the inflections, tone, and tenor of the dialogue, and the general demeanor of the prospective juror." *Taylor*, 67 Va. App. at 455 (alteration in original) (quoting *Smith v. Commonwealth*, 219 Va. 455, 464-65 (1978)). Accordingly, this Court does not find that the trial court abused its discretion in denying appellant's motion to strike Juror No. 4328 for cause.

Admission of Appellant's Handwritten Letter

The admission of evidence "is within the sound discretion of the trial court" and is reviewed under an abuse of discretion standard. *Beck v. Commonwealth*, 253 Va. 373, 384-85 (1997). Appellant bears the burden of proof that "the trial court's admission of evidence constitute[d] reversible error." *Alvarez v. Commonwealth*, 24 Va. App. 768, 776 (1997). "Only when reasonable jurists could not differ can [this Court] say an abuse of discretion has occurred." *Joyce v. Commonwealth*, 56 Va. App. 646, 663 (2010) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). "[T]he trial judge's 'ruling will not be reversed simply because an appellate court disagrees.'" *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)).

Generally, relevant evidence—evidence that "'tends to cast any light' on any material point"—is admissible. *Thomas*, 44 Va. App. at 753 (quoting *Seaton v. Commonwealth*, 42 Va. App. 739, 752 (2004)). Given the standard of review, "a great deal must necessarily be left to the discretion of the court of trial, in determining whether evidence is relevant to the issue or not."

*John Crane, Inc. v. Jones*, 274 Va. 581, 590 (2007) (quoting *Riverside Hosp. v. Johnson*, 272 Va. 518, 529 (2006)).  But even if logically relevant, evidence can be excluded if its probative value is substantially outweighed by the "likelihood of confusing or misleading the trier of fact" or being "needlessly cumulative."  Va. R. Evid. 2:403.  This determination involves a "balancing test" committed to the "sound discretion" of the trial court.  *Gamache v. Allen*, 268 Va. 222, 227-28 (2004).  Appellant asserts that the trial court abused its discretion when it admitted appellant's handwritten letter into evidence and allowed the Commonwealth to question him about it. Assuming without deciding, however, that the trial court erred in admitting the letter, such error was at most harmless.  "In Virginia, non-constitutional error is harmless 'when it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'"  *Brown v. Commonwealth*, 68 Va. App. 746, 794 (2018) (quoting *Lavinder v. Commonwealth*, 12 Va. App. 1003, 1009 (1991) (en banc)); *see also* Code § 8.01-678.  In making such determination, this Court must determine "whether the alleged error substantially influenced the [factfinder]."  *Haas v. Commonwealth*, 299 Va. 465, 467 (2021) (quoting *Clay v. Commonwealth*, 262 Va. 253, 259 (2001)).[6]

Such error is only harmless "if other evidence of guilt is so 'overwhelming' and the error so insignificant by comparison that we can conclude that error 'failed to have any "substantial influence" on the verdict.'"  *Holmes v. Commonwealth*, 76 Va. App. 34, 59 (2022) (quoting *Dandridge v. Commonwealth*, 72 Va. App. 669, 685 (2021)).  In other words, this Court must be able to say, "without usurping the jury's fact finding function, that, had the error not occurred, the verdict would have been the same."  *Brown*, 68 Va. App. at 794 (quoting *Lavinder*, 12 Va. App. at 1006).  Based on the uncontradicted evidence of appellant's guilt, already addressed

---

[6] When the defendant has had a jury trial, "a reviewing court must decide whether the alleged error substantially influenced the jury."  *Brown*, 68 Va. App. at 794 (quoting *Clay*, 262 Va. at 259).

- 16 -

above in response to appellant's insufficiency argument, and the absence of any exculpatory material in appellant's letter, this Court concludes that admission of the handwritten letter did not substantially influence the jury's verdict.[7]

## CONCLUSION

For the foregoing reasons, this Court finds that the trial court committed no reversible error. Accordingly, this Court affirms appellant's convictions.

*Affirmed.*

---

[7] This Court recognizes, however, that the "harmless-error" review is not synonymous with a "sufficiency" analysis. *Commonwealth v. White*, 293 Va. 411, 422 (2017).