COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, O'Brien and Lorish
Argued at Lexington, Virginia


JONATHAN ARMSTRONG WATKINS
                                                    MEMORANDUM OPINION* BY
v.          Record No. 0065-24-3               JUDGE LISA M. LORISH
                                                            JUNE 3, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
Christopher B. Russell, Judge

Kelsey Bulger, Deputy Appellate Counsel (Virginia Indigent
Defense Commission, on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Jonathan Armstrong Watkins challenges his convictions, arguing that the trial court erred

in refusing to instruct the jury on voluntary manslaughter. He also argues that the trial court

erred in denying his motion to strike the charges of murder and use of a firearm in the

commission of a murder. We find that the trial court did not abuse its discretion in refusing the

jury instruction because there was not more than a scintilla of evidence to support a voluntary

manslaughter instruction. Additionally, we find that the trial court did not abuse its discretion in

denying the motion to strike because there was sufficient evidence to submit the charges to the

jury. Thus, we affirm Watkins's convictions.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND

Katrina Dudley was shot and killed by a single gunshot wound to her head. Dudley and Watkins were in a romantic relationship and lived together in the trailer where she was killed. At the time of Dudley's death, Watkins was the only other person in the trailer. Watkins admitted that the shot came from his firearm, although his story as to how the shooting occurred changed over time, as recounted below.

After the shooting, Watkins drove 22 minutes to his mother's home, located about 13 miles away. He did not call for emergency services from the trailer because the trailer had no cable or phone service. Once Watkins arrived at his mother's home, she called 911 to report that "her son's girlfriend had suffered an accident and maybe shot herself." When police arrived at the trailer, Dudley was found leaned up against a television sitting on top of a backpack, with some blankets and folded up towels under her head. There was dry blood on the television in the shape of hands and fingers. Investigators found the trailer "pretty disheveled and messed up" with various items scattered across the floor, including a butter knife, chair, and hamper. EMS confirmed that Dudley had been deceased for at least ten minutes before they arrived, so there was no attempt to resuscitate her. Investigators recovered a nine-millimeter shell casing and a nine-millimeter handgun from the scene, approximately eight feet away from Dudley's body. The gun was found under a balled up blue sweatshirt. Officers testified at trial that there was a "mixed bowl of ammunition" of mostly nine-millimeter rounds on the kitchen table, a "revolver that was found in the pantry," a "Marlin .22 rifle" with some ammunition in a linen closet, and multiple "knives throughout the residence," including a folding knife on the nightstand and a pocketknife in Dudley's back pocket. There was a total of six guns in the residence.

While law enforcement investigated the scene, Watkins and his mother arrived at the trailer. Watkins spoke with Investigator Ryan McCullough at the scene, who noted that Watkins

- 2 -

was "very distraught" and that "[t]here was blood on his hands, dried up blood in the area of his hands." Watkins agreed to leave the trailer and go to the Sheriff's Office for further questioning.

During that interrogation, Watkins's account of what happened varied. At trial, an officer testified about his changing story, and the jury watched a video of the interview with Watkins. In that interview, Watkins said that he and Dudley had argued before the shooting, accusing each other of cheating. Dudley threw baby powder at him and threatened to harm herself with a knife. Watkins "didn't want to leave her with anything that she'd hurt herself with," so he put his nine-millimeter gun in his bag as he prepared to leave the trailer. Watkins stated to police that he and Dudley were "face to face, eye to eye when the altercation takes place and the firearm is fired."

He initially told police that when the gun went off, they were standing towards the foot of the bed, but later said that he was at the foot of the bed and she was standing on the bed. The officer testifying at trial recounted that at points Watkins "said they were both holding the firearm," but at other times he said the firearm went off "during a push and shove." Watkins later "changed it to say that there wasn't a push pull, that she was trying to shove him and grabbed the gun." Watkins also claimed that "her hand hit the firearm, which caused it to go off." And finally, he said at a different point that "she jerked it and that's when it went off." The officer testified that "what was stated most . . . throughout the interview was I, I don't know how the firearm actually went off." Watkins also made a drawing of the scene for law enforcement and wrote at the top, "active of freakiness from the Lord." The officer testified that "[a]fter we talked a little bit, he scribbled out Lord and wrote down devil."

When Watkins was asked why he did not stop somewhere closer than his mother's house to get help sooner, he said the closer neighbors were "snitty," "weird," and "[t]hey wouldn't wave at you coming up and down the road." Officers arrested Watkins the same day.

The next day, Watkins asked police if they were "able to obtain more information about the injuries to Katrina" and said that he wanted to speak with them again. The officers read Watkins his *Miranda v. Arizona*, 384 U.S. 436 (1966), rights before speaking with him. During this interview, Watkins told investigators that Dudley had "shoved him" and "her hand was right there at the gun when it went off and immediately follows it with, you know, if her hand wouldn't have been on it, if it wouldn'ta hit it, it wouldn'ta went off."

During Watkins's four-day jury trial, the Commonwealth presented the evidence above as well as testimony from Dr. Amy Tharp, an assistant chief medical examiner and the lead pathologist at the Office of the Chief Medical Examiner in Roanoke. Dr. Tharp testified that during Dudley's autopsy, she found that there were two gunshot wounds: a wound just behind the right ear with soot and stippling around the wound, and another exit wound where the bullet went through the top of her head. Dr. Tharp read part of her case summary to the jury:

> Police reports and interview statements indicate the significant other reported they were face to face with the gun in his right hand and her reaching for it with her left hand. He could provide no explanation for why, if the decedent was reaching for the gun with her left hand, the entrance was behind her right ear at near close range less than three inches, closer to one and a half inches. He also offered up that she was pushing him when the gun fired, that her hand possibly struck the weapon when it fired and then that it did not involve pushing but that she grabbed his arm but all variations were reported as a face to face event.

She concluded that the "range of fire and location of entrance do not correspond to any of the explanations provided" by Watkins.

The Commonwealth also presented evidence that both Watkins and Dudley had gunshot residue particles on their hands. An analyst at the Virginia Department of Forensic Science, Douglas DeGaetano, testified that "primer residue can be deposited on the hands by circumstances such as firing a weapon, handling a weapon, being in proximity to the discharge of a weapon or

coming into contact with an object that has primer residue on it," but that "[t]he number of confirmed particles cannot use, be used to determine which of those scenarios occurred."

After the Commonwealth rested, Watkins moved to strike. He argued that there "is no evidence to support that he killed [Dudley]" or to prove malice or premeditation. Watkins first argued that there was no evidence of first-degree murder because "[t]here's no specific deliberate act that the Commonwealth can show you in the evidence that they have presented that would be a deliberate act on the part of the defendant."

Watkins next moved to strike the second-degree murder charge, arguing there was no evidence of malice. Watkins claimed that there is "no physical evidence, no testimonial evidence introduced that any reasonable inference can be drawn that Mr. Watkins's actions were the direct cause of the discharge of the projectile." He contended that "everything here points to an accidental discharge of a firearm that strikes here with a fatal blow" and that this case is "possibly an involuntary manslaughter or a manslaughter of some type but murder doesn't exist here."

Lastly, Watkins argued that "if there is no murder, there can be no discharge of a firearm in the commission of a murder and that is the indictment as charged that there's murder. And so if the Court strikes the first or second degree murder, that charge also must be dismissed." The court denied the motion to strike. Watkins presented no evidence and renewed his motion to strike, which was again denied by the court.

When the parties offered their proposed jury instructions, the Commonwealth opposed a waterfall instruction that included voluntary manslaughter, arguing that there was no evidence of heat of passion or provocation. Watkins contended that a voluntary manslaughter instruction should be given because the shooting happened right after Dudley and Watkins had a physical altercation that was not "a normal argument between a couple," given that Dudley threatened to harm herself. When Watkins tried to leave the trailer, "Dudley then interacted with the gun and, and however way

- 5 -

the Court or jury could interpret it but she involves herself in what's happening with that firearm," which he argued "falls squarely within the sort of provocation that heat of the passion should include." The court denied the proposed instruction, reasoning that "an instruction on voluntary manslaughter would require evidence that the defendant acted from passion rather than malice in response to legally adequate provocation. And I find no such evidence to support an instruction on that."

The jury found Watkins guilty of second-degree murder and use of a firearm in the commission of murder. Watkins was sentenced to 41 years with 20 years suspended. This appeal followed.

## ANALYSIS

I. The trial court did not err in refusing to instruct the jury on voluntary manslaughter.

"When reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)). This Court reviews a trial court's decision to give or deny a jury instruction for an abuse of discretion. *Gaines v. Commonwealth*, 39 Va. App. 562, 568 (2003) (en banc).

On appeal, Watkins argues that the trial court erred in denying his proposed instruction on voluntary manslaughter because there was "more than a scintilla of evidence to support an instruction." He contends that "[v]iewing the evidence in the light most favorable to Watkins, Katrina struggled with him, assaulted him, and attempted to prevent him from leaving" and that "[u]nder these facts, a jury could determine that reasonable provocation existed and the gun was fired in the heat of passion." The Commonwealth counters that "[n]either the defendant's statements to law enforcement, nor other evidence presented at trial, provided the necessary quantum of independent evidence to support a voluntary manslaughter instruction" and that

- 6 -

"Watkins' theory was *not* that he *intentionally* killed Dudley in a heat of passion. He argued that the gun somehow went off and killed her, contrary to Watkins' intent." Because we agree with the Commonwealth, we affirm the trial court's ruling.

"[A] trial court must instruct the jury on the lesser-included offense of voluntary manslaughter if the evidence of heat of passion and reasonable provocation amounts to 'more than a scintilla.'" *Dandridge v. Commonwealth*, 72 Va. App. 669, 682 (2021) (alteration in original) (quoting *Turner v. Commonwealth*, 23 Va. App. 270, 275 (1996)). "This Court has avoided establishing a precise definition for the term 'scintilla' because to do so would be 'neither practical nor helpful.'" *Williams v. Commonwealth*, 64 Va. App. 240, 247 (2015) (quoting *Brandau v. Commonwealth*, 16 Va. App. 408, 411 (1993)). Rather, "[t]he weight of the credible evidence that will amount to more than a mere scintilla . . . is a matter to be resolved on a case-by-case basis." *Woolridge v. Commonwealth*, 29 Va. App. 339, 348 (1999) (second alteration in original) (quoting *Brandau*, 16 Va. App. at 412). "If any credible evidence in the record supports a proffered instruction . . . failure to give the instruction is reversible error." *Brown v. Commonwealth*, 68 Va. App. 746, 790 (2018) (alteration in original) (quoting *Boone v. Commonwealth*, 14 Va. App. 130, 132 (1992)).

In Virginia, "[v]oluntary manslaughter is the unlawful killing of another, 'committed in the course of a sudden quarrel, or mutual combat, or upon a sudden provocation, and without any previous grudge, and the killing is from the sudden heat of passion growing solely out of the quarrel, or combat, or provocation.'" *Dandridge*, 72 Va. App. at 681-82 (alteration in original) (quoting *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016)). "[I]n other words, a voluntary manslaughter is an intentional killing, but the intent to kill was generated by passion/provocation rather than by an evil disposition." Bacigal and Lain, *Virginia Practice: Criminal Offenses and Defenses*, Homicide, § III(A) (2020). "Heat of passion excludes malice when provocation

reasonably produces fear that causes one to act on impulse without conscious reflection." *Graham v. Commonwealth*, 31 Va. App. 662, 671 (2000). "The law requires the simultaneous occurrence of both reasonable provocation and passion." *Id.*

Here, there was not more than a scintilla of evidence that there was reasonable provocation or passion to warrant a voluntary manslaughter instruction. At trial, Watkins repeatedly and consistently set forth an "accident" theory. Even in his motion to strike, he argued that "everything here points to an accidental discharge of a firearm that strikes here with a fatal blow." Although it is true that Watkins, at one point, told investigators that Dudley had "shoved him" and thrown baby powder on him, and that the couple had accused one another of cheating, he also consistently said that "he would never pull the trigger on her."

Nor was there any evidence that Watkins feared or was provoked by Dudley. On the contrary, Watkins only suggested that he was afraid that Dudley would harm *herself*, which is why he had the nine-millimeter gun in hand in order to remove it from the trailer. At trial, Watkins argued that "[t]he closest you can come to his anger is that she was throwing things at him and that that . . . would be an inference for a natural person to become angry but there is no other evidence of his actions and his behaviors that showed anger." Even now, Watkins maintains on brief that "the evidence contained no statements from Watkins that involved threats, promises, or even a desire to kill or physically harm Katrina. Instead, the evidence established that the two were in love. There was no ongoing animosity between the two."

Even when viewing the evidence in the light most favorable to Watkins, nothing supports the presence of the "*furor brevis*" necessary to render Watkins "deaf to the voice of reason" so as to warrant a voluntary manslaughter instruction. *Caudill v. Commonwealth*, 27 Va. App. 81, 85 (1998). Because there was not more than a scintilla of evidence that there was the heat of

passion or provocation required for a voluntary manslaughter instruction, the trial court did not abuse its discretion in refusing the instruction.

II. The court did not err in denying Watkins's motion to strike.

"A motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013)). "When the sufficiency of [the Commonwealth's] evidence is challenged by a motion to strike, the trial court should resolve any reasonable doubt as to the sufficiency of the evidence in the [Commonwealth's] favor." *Avent v. Commonwealth*, 279 Va. 175, 198 (2010) (alterations in original) (quoting *Banks v. Mario Indus.*, 274 Va. 438, 454 (2007)). A motion to strike should only be granted "when it is conclusively apparent that [the Commonwealth] has proven no cause of action against defendant, or when it plainly appears that the trial court would be compelled to set aside any verdict found for the [Commonwealth] as being without evidence to support it." *Id.* at 198-99 (alterations in original) (quoting *Banks*, 274 Va. at 455). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

Watkins argues on appeal that the trial court erred in denying his motion to strike both the murder charge and the charge for his use of a firearm during the commission of a murder. Finding the evidence sufficient to support the elements of each offense, we disagree with Watkins and affirm the trial court's ruling.

a. The evidence was sufficient for a finding of second-degree murder.

First, regarding the second-degree murder charge, Watkins contends that "the record is devoid of evidence of malice," that he was "panicked and distraught, ran for help, and

cooperated with the police," and did not "*deliberately* use a deadly weapon" nor "intentionally fire the gun in close proximity to Katrina." He further argues that even "viewing the evidence in the light most favorable to the Commonwealth, the evidence of heat of passion and provocation was sufficient to negate malice."

The Commonwealth counters that there was "plentiful circumstantial evidence of malice" as, for example, Watkins opted to drive 13 miles to his mother's house to get help for Dudley, although he passed by houses, a fire station, a zoo, a café, and a hotel along the way. The Commonwealth also highlights that Watkins's "statement that he took one of the many guns in the trailer with him, so that Dudley would not hurt herself, made no sense as well, considering the cache of weapons, including guns and knives, kept in the mobile home."

We affirm the trial court's denial of the motion to strike because there was sufficient evidence for the second-degree murder charge. "Second-degree murder does not require a willful, deliberate, and premeditated act; it is defined simply as a malicious killing." *Turner*, 23 Va. App. at 274.

> [T]his Court has specifically explained that '[t]he word "malice" . . . is used in a technical sense, and includes not only anger, hatred and revenge, but every unlawful and [unjustified] motive. *It is not confined to ill will to any one or more particular persons*, but is intended to denote an action flowing from any wicked and corrupt motive, done with an evil mind and purpose and wrongful intention, where the act has been attended with such circumstances as to carry in them the plain indication of a heart regardless of social duty and deliberately bent on mischief.

*Watson-Scott v. Commonwealth*, 298 Va. 251, 256 (2019) (second, third, and fourth alterations in original) (quoting *Martin v. Commonwealth*, 184 Va. 1009, 1015 (1946)). "Whether or not an accused acted with malice is generally a question of fact and may be proved by circumstantial evidence." *Palmer v. Commonwealth*, 71 Va. App. 225, 237 (2019) (quoting *Canipe v. Commonwealth*, 25 Va. App. 629, 642 (1997)). "In drawing inferences from the evidence, the

fact finder may conclude regarding even a non-testifying defendant that his false statements establish that he lied to conceal his guilt." *Williams v. Commonwealth*, 71 Va. App. 462, 484 (2020).

Moreover, malice may be either express or implied by conduct. *Pugh v. Commonwealth*, 223 Va. 663, 667 (1982). Express malice exists when "one person kills another with a sedate, deliberate mind, and formed design." *Id.* at 668 (quoting *M'Whirt's Case*, 44 Va. (3 Gratt.) 594, 604 (1846)). "[I]mplied malice[] exists where a defendant lacks the deliberate intent to kill, but the circumstances of the defendant's actions are 'so harmful that the law punishes the act as though malice did in fact exist.'" *Watson-Scott*, 298 Va. at 256 (quoting *Pugh*, 223 Va. at 668). Lastly, "malice may be inferred from the deliberate use of a deadly weapon." *Smith v. Commonwealth*, 239 Va. 243, 264 (1990) (quoting *Warlitner v. Commonwealth*, 217 Va. 348, 349 (1976)).

Here, there was sufficient evidence for a jury to find that Watkins acted with malice, as the jury had the opportunity to consider the "circumstances of the defendant's actions" and whether he deliberately used the gun. *Watson-Scott*, 298 Va. at 256. Watkins stated that he did not know how the gun went off, but at other times claimed that he and Dudley were face-to-face when it fired. He later said that Dudley was actually standing on top of a mattress when the shooting occurred. Eventually, he claimed that the gun went off when Dudley grabbed it from him. The jury could have considered the inconsistencies of Watkins's story, including his claim that he took the nine-millimeter gun with him because he did not want to leave Dudley "with anything that she'd hurt herself with," while leaving various guns and knives throughout the trailer. Moreover, the jury was entitled to credit Dr. Tharp's testimony that the "range of fire and location of entrance do not correspond to any of the explanations provided." Lastly, the jury could have considered the fact that Watkins did not ask for help from a neighbor because he

found them "snitty" and "weird"—even though Dudley was still alive when he left the trailer—and instead drove 22 minutes away to his mother's house, passing several businesses along the way. Given these facts, a jury could properly find evidence of malice from either the deliberate use of a weapon or due to the "circumstances of the defendant's actions" that could be seen as "so harmful that the law punishes the act as though malice did in fact exist." *Pugh*, 223 Va. at 668.

b. The evidence was sufficient for a finding of causation.

Watkins argues on brief that he "denied pulling the trigger," that "[e]vidence supported the theory that Katrina had her hand on the gun, and caused it to discharge," and that "the Commonwealth's evidence failed to exclude the reasonable hypothesis of innocence that Katrina caused the gun to discharge." Watkins would have us conclude that there was insufficient evidence to prove that he caused Dudley's death.

The Commonwealth counters that the "physical evidence did not support Watkins' hypothesis that the gun somehow discharged as he and Dudley faced each other, pushing and shoving the firearm, or that the gun discharged when Dudley hit Watkins' arm," and that "his actions reflect one who sought to hide his guilt," given that Watkins "did not try to save Dudley's life, but rather to hide his culpability," which supports that Watkins caused Dudley's death.

We find that the jury was not without evidence in determining that Watkins caused Dudley's death. Here, there is no question that Watkins and Dudley were the only two in the trailer when the shooting occurred. While true that both of their DNA was found on the gun in question, the jury was entitled to believe the Commonwealth's theory that Watkins had pulled the trigger based on the evidence before it, particularly Dr. Tharp's testimony that Dudley's

injuries were not consistent with Watkins's description of the incident. The fact finder is the ultimate judge of credibility, and the jury here did not lack evidence to support its verdict.

III. The evidence was sufficient to support Watkins's conviction of use of a firearm during the commission of murder.

Lastly, Watkins argues that "[b]ecause the evidence was insufficient as a matter of law to prove murder, Watkins's conviction for use of a firearm in the commission of murder must be reversed," further noting that "the Commonwealth agreed that if the evidence failed to prove murder, then the use of a firearm charge must be dismissed too."

To support a conviction for use of a firearm during the commission of a felony under Code § 18.2-53.1, the Commonwealth must prove that the defendant "use[d] or attempt[ed] to use any pistol, shotgun, rifle, or other firearm . . . while committing or attempting to commit murder." "The weight which should be given to evidence and whether the testimony of a witness is credible are questions which the fact finder must decide." *Bridgeman v. Commonwealth*, 3 Va. App. 523, 528 (1986). Here, the jury considered the evidence before it and rejected Watkins's narrative that the gun discharged accidentally due to Dudley's conduct. Instead, it was entitled to believe that Watkins used a firearm while committing a murder.

In sum, the Commonwealth's evidence was credible and sufficient to submit to the jury the charges of second-degree murder and use of a firearm in the commission of murder. Thus, the trial court did not err in denying the motion to strike.

CONCLUSION

Finding no error in the trial court's judgments, we affirm Watkins's convictions.

*Affirmed*.